594 A.2d 1309

ESTHER LANZET, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATES OF ANNA LANZET AND MAX LANZET, DECEASED, PLAINTIFF-APPELLANT, v. LAWRENCE M. GREENBERG, M.D.; SAVEREN SCANNAPIEGO, M.D.; ROSE L. OEN, M.D.; AND TALLAT BEKHIT, M.D., DEFENDANTS-RESPONDENTS, AND (FICTITIOUSLY NAMED) JOHN DOE, M.D.; RICHARD ROW, M.D.; JANE DOE, R.N.; MARY ROE, R.N.; AND GREENVILLE HOSPITAL, DEFENDANTS.

Argued February 13, 1991—Decided September 4, 1991.

169

*Francis X. Dorrity* argued the cause for appellant.

*Hugh P. Francis* argued the cause for respondent Rose L. Oen, M.D. (*Francis & Berry*, attorneys; *Evelyn C. Farkas*, on the brief).

*Robert D. Kretzer* argued the cause for respondent Tallat Bekhit, M.D. (*McDonough, Korn & Eichhorn*, attorneys).

*Neil Reiseman* argued the cause for respondent Saveren Scannapiego, M.D. (*Reiseman, Mattia & Sharp*, attorneys; *Deirdre Dennis Ferrie*, on the brief).

*Bradley M. Wilson* argued the cause for respondent Lawrence M. Greenberg, M.D. (*Feuerstein, Sachs, Maitlin & Fleming*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

In this medical-malpractice case, a patient undergoing a rather common cataract procedure lapsed into a coma from which she never recovered. There was clear evidence of neglect by the operating-room physicians adduced from the testimony of the physicians themselves. Their testimony independently established that they did not know among themselves who had the duty to terminate the operation when the patient's vital signs declined. The Appellate Division reversed a jury verdict for damages against the operating-room physicians and a consulting internist, primarily on the basis that plaintiff's expert testimony did not establish a deviation from a required stan-

dard of care that was the proximate cause of plaintiff's injuries. We find that the aggregate of the testimony of the parties and the experts was sufficient to sustain the verdict, but we remand for a new trial on other grounds.

Plaintiff's decedent, Anna Lanzet, sustained oxygen deprivation to her brain as a result of cardiac arrest during an eye operation. That deprivation caused brain damage that left her in a persistent vegetative state until her death thirteen months later. During her lifetime, Anna and her husband, Max, instituted this proceeding. Max Lanzet died, and their daughter, Esther Lanzet, has continued the litigation as administratrix ad prosequendum. A jury found all four defendants liable and awarded to the estate of Anna Lanzet damages in the amount of $208,232, the stipulated amount of her medical expenses, and to Max's estate $500,000 on his per quod claim. It awarded nothing to Anna's estate for her pain and suffering. All four defendants moved for judgment notwithstanding the verdict, a new trial, a remittitur on Max's damages, or "any other relief pursuant to *Rule* 4:49–1 and 2." Plaintiff moved for a new trial on Anna's damages. The trial court denied the motions for judgment notwithstanding the verdict, granted defendants' motions for a new trial on the per quod award, and granted plaintiff's motion for a new trial on Anna's damages, limited to damages arising from her disability and impairment. The Appellate Division denied defendants' motions for interlocutory appeal from the judgment on liability but granted plaintiff leave to appeal. It then affirmed the trial court's order that limited Anna's claim to disability and impairment, explicitly excluding pain and suffering. 222 *N.J.Super.* 540, 537 *A.*2d 742 (1988).

On retrial, the jury returned a verdict of $1,300,000 for Anna's disability and impairment and $260,000 on Max's per quod claim. Defendants appealed. The Appellate Division held that plaintiff had failed to prove a prima facie case because the medical expert's testimony had failed adequately to establish the relevant standard of care and causation. The court there-

fore held that the defendant physicians were not liable and reversed the order denying judgment notwithstanding the verdict. 243 *N.J.Super.* 218, 579 *A.*2d 309 (1990). We granted certification, 122 *N.J.* 396, 585 *A.*2d 395 (1990), and now reverse in part the judgment of the Appellate Division. We hold that the evidence sufficed to establish a standard of care, a deviation from that standard, and a causal link between the deviation and the injury. We believe, however, that in the circumstances of this case, because the instructions to the jury did not recite sufficiently the principles of medical causation that applied to the proofs before the jury, the proper appellate response is to order a new trial rather than enter judgment for either party.

I

Because we are reviewing the denial of a judgment notwithstanding the verdict, we view the facts in the light most favorable to plaintiff. *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969); *R.* 4:40–2. Judge Antell, writing for the Appellate Division, accurately and concisely summarized what happened in the hospital:

> Anna Lanzet was admitted on August 28, 1983, to Greenville Hospital in Jersey City for surgery the following day. Dr. Oen, an internist, examined her on the day of her admission and prescribed Hydro–DIURIL, a diuretic, to lower her blood pressure. Mrs. Lanzet, who was 65 years old, had been treated for high blood pressure for the previous two years. Dr. Oen then cleared the patient for surgery the following morning and recommended a local anesthesia.
>
> On the morning of surgery Dr. Oen was notified that Mrs. Lanzet's blood pressure was again elevated to a reading of 170/100. By telephone, Dr. Oen then prescribed an administration of Lasix, another diuretic. The medication was given and the patient's blood pressure returned to 140/94. She was then again cleared for surgery by Dr. Oen.
>
> Dr. Bekhit, the anesthesiologist, also examined Mrs. Lanzet on the evening of August 28 and again on the morning of surgery. He knew that a drug had been administered to lower the patient's elevated blood pressure, and he concluded from his examination that surgery was not contraindicated. Before the operation, Dr. Bekhit discussed the case with Dr. Greenberg, who, assisted by Dr. Scannapiego, was to perform the cataract surgery. Since it was to be done under a local anesthetic, Dr. Bekhit's role was essentially to monitor the patient and to respond to emergencies involving her vital signs. [243 *N.J.Super.* at 222–23, 579 *A.*2d 309.]

We note several additional details regarding the operation for a complete record. Dr. Oen's initial assessment of Anna's readiness for surgery included a review of her radiologist's x-ray report. The radiologist had concluded that she suffered from chronic congestive heart failure and an enlarged heart. Dr. Oen disagreed with that reading. She did not consult with the radiologist about the divergent readings.

The cataract operation was performed under local anesthesia. The anesthetic was injected into the sensory nerves behind the eyeball. That anesthetic will, in many instances, prevent stimulation of the vagal nerve, which in turn will slow the heart rate. The operation consisted of a surgical slice into the eye, removal of the cataract, insertion of a plastic lens, and resealing of the eye.

One of the ophthalmologic surgeons, Dr. Greenberg, performed the surgery. Dr. Scannapiego, also an ophthalmologist, acted as assistant surgeon. Throughout the operation, both of the surgeons had to maintain a constant focus on the patient's eye, each through a separate microscope in the operating room, somewhat as if they were viewing the eye through a twin set of binoculars. The rest of Anna Lanzet's body was under what was described as a tent-like drape. Only her upper face was visible to the eye surgeons.

Throughout the operation, Dr. Greenberg sat at the head of the operating table. Dr. Scannapiego sat just to his left. Dr. Bekhit, the operating-room anesthesiologist, was at Dr. Greenberg's right, beside the patient. He had access to the patient's arm and hand. There was also an electrocardiogram (EKG) machine in the operating room. When attached to the patient, that machine constantly reports a patient's pulse rate and emits (we are told in this case) both audible and visible signals. The former is referred to as a "beep" and the latter as a "monitor," presumably an illuminated numerical reading. A "code" is a signal to available heart emergency teams to report immediate-

ly to the scene of need to administer cardio-pulmonary resuscitation (CPR) to the patient.

Judge Antell recounted the events during the operation:

Surgery began at approximately 11:15 a.m. after the patient had been given 1 cc of Innovar (a very small dose), a sedative which plaintiff's expert acknowledged to be a "perfectly appropriate medication to give preoperatively." At 11:20 a.m. it was noted that the patient's pulse had dropped to 45 from a reading of 65 at 11:10 a.m. Dr. Bekhit responded by administering intravenously .4 milligrams of Atropine and after one or two minutes the rate returned to 60, an acceptable level for surgery. Between 11:32 and 11:35 a.m. the pulse rate resumed its decline and fell below 40. Thereupon another .2 milligram dose of Atropine was administered and a third administration was given between 11:36 and 11:37 a.m. At 11:40 a.m., when the rate dropped to 20 and the patient became cyanotic [blue discoloration attributable to loss of oxygen], a code was called and the operating team applied themselves exclusively to resuscitative measures. By this time, however, the curtailed blood flow to the brain and the resulting oxygen starvation resulted in a global cerebral hypoxia which left Mrs. Lanzet in a chronic persistent vegetative state until her death some 13 months later. [243 N.J.Super. at 223, 579 A.2d 309.]

## II

The qualitative difference between the standard to grant a new trial and the standard to grant a judgment notwithstanding the verdict must be recognized. A motion for a judgment notwithstanding the verdict, R. 4:40–2, like one for involuntary dismissal, R. 4:37–2(b), must be denied "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37–2(b); see S. Pressler, Current N.J. Court Rules, R. 4:40–2 comment (1991). In each case, "the court must accept as true all the evidence which supports the position of the party defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied." S. Pressler, supra, R. 4:40–2 comment (1991); see Dolson v. Anastasia, supra, 55 N.J. at 5–6, 258 A.2d 706 (distinguishing this "rather mechanical" standard from the more discretionary standard that the reviewing court may apply in connection with a new trial motion).

That standard for *resolving* issues of fact, however, is vastly different from the standard for *retrying* issues of fact. The latter is a more flexible standard by which the court may set aside the verdict of the jury, if contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice, or partiality. The essence of that standard has been incorporated in *Rule* 2:10-1, which permits an appellate court to overrule a trial court's ruling on a motion for new trial if "it clearly appears that there was a miscarriage of justice under the law." An appellate court should give considerable deference to a trial court's decision to order a new trial, as the trial court has gained a "feel of the case" through the long days of the trial.

### III

The critical issue in this appeal is whether there is any evidence from which a jury could have inferred that one or more of the physicians had deviated from accepted medical standards in their care of the patient and whether any such deviation was a factor that contributed to cause Anna Lanzet's brain to lose oxygen and to cause her to slip into the coma from which she never recovered.

Some of the confusion below may stem from the scattershot approach that plaintiff took to assess liability against the defendant physicians. At times plaintiff seemed to be pursuing an *Anderson v. Somberg,* 67 *N.J.* 291, 338 *A.*2d 1, *cert. denied,* 423 *U.S.* 929, 96 *S.Ct.* 279, 46 *L.Ed.*2d 258 (1975), approach to liability, suggesting that someone had to be responsible for plaintiff's misfortune. This is in no sense an *Anderson v. Somberg* case, in which one of the defendants had to have been responsible for leaving a broken tip from a surgical instrument in the plaintiff's body. In addition, plaintiff here pursued theories of liability that her expert could not or would not sustain. For example, plaintiff asserted that the reinjection of Atropine following the second decline in the heart rate was a deviation, but plaintiff's expert had to admit on cross-examina-

tion that in his own treatise on anesthesiology he had stated that reinjection is an accepted medical practice when a patient does not respond to the first dosage. Understandably, counsel for defendants argued that plaintiff's expert had exonerated them of liability on a central charge of malpractice. Nevertheless, exoneration of defendants on that theory of liability did not exonerate them on all theories of liability.

One critical aspect of deviation plainly presented a jury question of liability, albeit perhaps under an incorrect theory of responsibility. That aspect questioned the failure of the operating surgeons to heed the anesthesiologist's suggestion to terminate the operation during the critical five-minute period when the patient's heart rate was failing and at a time when catastrophic results might have been avoided.

In considering the issue of sufficiency of the evidence, we cannot limit ourselves to what one witness said or even one expert's theory of neglect. The question under the rule of appellate review is whether, considering "all the evidence" from both plaintiff and defendants, there is an adequate basis in law for a finding of professional neglect. S. Pressler, *supra*, *R.* 4:40-2 comment.

By far the clearest examples of the sufficiency of the evidence of malpractice, at least with respect to the three operating-room physicians, came from Dr. Hein, one of the defense experts. A significant amount of trial time was devoted to the cause of Mrs. Lanzet's heart failure. Dr. Hein believed that a mechanical blockage had caused the heart failure and thus the loss of oxygen. As no autopsy was performed, there is no medical certainty about what caused her heart failure. At times the trial was confused by the question of whether the physicians' conduct was the cause of the heart problem. Plaintiff, however, had to establish not that the heart episode was caused by the physicians' neglect but rather that they had insufficiently attended to it when it developed.

Hence, of critical significance to plaintiff's case was whether she had established any deviation on the part of the three operating-room physicians that lessened the patient's chances of recovery. On cross-examination, plaintiff's counsel put to the defense expert, Dr. Hein, an assessment of his opinion in light of the various items of evidence. Plaintiff's counsel, in an extended question, asked the physician to consider all of the evidence favorable to plaintiff's case, including the fact that the cardiac monitor had made a beeping sound with each heartbeat; that Anna Lanzet's heart rate had slowed from sixty to twenty between 11:30 and 11:40; that between 11:35 and 11:40 three additional dosages of Atropine had been given, and each time the anesthesiologist told everyone in the operating room what the response was or was not; that the heart rate had continued to go down; that at about 11:35 the circulating nurse had poked the surgeon in the back and said, "Look over at the monitor"; that the operation had not concluded until 11:40; that when the drapes had been removed from the patient, the nail beds of her right hand were cyanotic or discolored; and that the patient's face or lips had been bluish in color and the patient had been pale and sweating. Dr. Hein was asked if, under those circumstances, he would say that the damage had occurred during the surgery. He replied that it was difficult to answer because he knew from the documents and the testimony that "some of the things that [plaintiff's counsel] asked me were, in fact—did not happen, and this is why my opinion is based upon what I know as being fact." Plaintiff's counsel followed up the question, asking:

Q. If—if, in fact, any of the facts that I related are true, then your opinion would not be valid. Is that fair to say?

A. Well, I would say, if—in answer to that question, it's possible that if the— if she were attended to faster, it might have made a difference, although I still suspect that the pulmonary embolism was the underlying cause of this, and regardless of what was done and at what time, the same—the end result would have been exactly the same.

That admission mirrors the opinion of plaintiff's expert, Dr. Stark, that an "earlier intervention would have saved Anna Lanzet's brain."

The standard of care expected of the physicians was not disputed. The trial judge elicited that standard from the defense expert, Dr. Hein. Paraphrasing a question that had been asked by counsel, the court asked:

THE COURT: Postulating standards, whether there's a departure from it or honoring it, adhering to it, is part of the standard that the operating room personnel be attentive to the needs of the patient? I believe that is the question.

THE WITNESS: The answer, judge, would be yes, of course.

[PLAINTIFF'S COUNSEL]: It would be good, sound operating room procedure for everyone in there, including the surgeons and the anesthesiologist, to be aware of the patient's needs. Isn't that fair to say?

A. Yes.

There is simply no doubt in this case that there was evidence of a standard of care required of all attending physicians in the operating room. Because the defense expert conceded that "if she were attended to faster, it might have made a difference," all that remained for the jury to determine, by that defense witness's own admission, was whether the "good sound operating room procedure for everyone in there * * * to be aware of the patient's needs" had been followed.

For each of the critical facts concerning "aware[ness] of the patient's needs," plaintiff did not rely on her expert to establish the facts. She established the facts by calling as her own witnesses the physicians who had attended to Mrs. Lanzet, as well as the operating-room personnel. Dr. Bekhit, the anesthesiologist, testified directly from his anesthesiology records, of which a blowup had been made and set up on a chart in the courtroom. He said that at 11:35 the patient's heart rate had dropped. Originally, in his deposition he had said that it had dropped to twenty heartbeats per minute at 11:35, but at trial he said he had made a note: "11:35, rate dropping to 30 and lower." He was asked, "did it continually go down?" He said, "it didn't go up." He was asked if he had informed the attending physicians. He said, "I told them what was there." He was asked if he had suggested that they discontinue the operation. He said, *"I did suggest stopping the operation."* (Emphasis added).

Nurse Algeria, the circulating nurse, testified to notations made at 11:35: "Rate dropping to 30 and lower." There was conflicting evidence on exactly when she "poked" the surgeon in the back, but at one point she said that the decline in the heart rate and the poke had "coincided," which would put the time of danger at a full five minutes. She testified that as she had stood at the far end of the operating room table at 11:35, she could hear the patient's heart rate declining. She described the operating room as "very quiet and serene." Dr. Hein, who testified on behalf of Dr. Greenberg, agreed that "every doctor would know what the beeps are signifying." Such a drop in the heart rate was of critical significance because Dr. Bekhit had testified on depositions that the operating team had been made aware of the initial drop in the heart rate at 11:20 and of his initial treatment, and "of the recovery, of course, because if it didn't recover, everything would stop." By 11:35 the rate had dropped to thirty.

All of the operating-room physicians agreed that they were aware that the patient had had an episode of elevated blood pressure that morning and that they were to "monitor the patient closely." Dr. Bekhit conceded that at 11:35 the patient's condition had become serious, although he had still believed that he could maintain her heart function. Dr. Bekhit insisted that he had kept the surgeons informed of her condition. Dr. Greenberg agreed that if the patient had chronic congestive heart failure, a condition that the patient's records disclosed, it "is a serious condition * * * yes it is."

In addition, Dr. Bekhit's examination by plaintiff's counsel established the basis for a finding of inattention by the operating team:

Q. Did you speak to [Dr. Greenberg] more than once?
A. Yes, I did.
Q. What did you talk to him about after 11:35?
A. The blood pressure is such and the heart rate is such and it is dropping.
Q. Did you tell him you were giving Atropine?
A. I did.

Q. Did you tell him that the blood pressure and the pulse were continually dropping?

A. I did.

Q. Did you discuss stopping that surgery?

A. *I did suggest stopping the operation.* Then, they see at what stage and whether it is safe for them to stop the operation and start resuscitation if needed or not. Why do you stop an operation? To do something, right?

Q. Was the patient in any danger during this five-minute interval between 11:35 and 11:40?

A. I can tell you whether she was in danger or not.[1] [Emphasis added.]

To hold that a prima facie case of deviation had not been made out would render pointless the extended line of cross-examination of Dr. Stark by one of the defense counsel. He asked Dr. Stark to accept his view of the facts: (1) that Nurse Algeria's "poke" had occurred at 11:40 (not 11:35), and (2) that there had been "no communication between Dr. Bekhit [and the surgeons] as to [the patient's] heart rate between 11:35 and 11:40." He then asked Dr. Stark: "If that were a fact in this case, that would change your opinion with regard to any deviation on the part of Dr. Scannapiego and Dr. Greenberg as well. Correct?" Dr. Stark answered: "Yes." But the question proves the point. If the facts were otherwise, there was a deviation and the jury was uniquely qualified to resolve the factual dispute.

In addition, a reviewing court must consider what it totally misses in a dry record of the case—that indefinable sense of what went on in the courtroom. That ever-changing dynamic of facial expressions, belief, and disbelief is what inexorably leads a jury to its verdict. The trial court caught the essence of it when it reminded counsel in its letter opinion that a particular defense theory "must be viewed in light of the recapitulation of the evidence [as to the theory] here set forth, *the words incapable of conveying the graphic detail of in-court testimony.*" (Emphasis added).

---

[1] We assume that this answer was probably "I can't tell you whether she was in danger or not."

This jury could not but have experienced a shattering loss of confidence in the defense version in view of the patently conflicting statements of the physicians themselves. The original report of Dr. Scannapiego dictated contemporaneously with the operation was no longer available. A cassette in the recording machine was said to have run out. Plaintiff's counsel read to the jury a devastating comparison of answers to requests for information about how the operation had proceeded. We summarize but a few of them:

| REQUEST FOR ADMISSION | RESPONSES | | |
|---|---|---|---|
| | Dr. Bekhit | Dr. Greenberg | Dr. Scannapiego |
| The operation on Anna Lanzet started at 11:15 a.m. on August 29, 1983 | Admits | "I have insufficient knowledge with respect to this and accordingly I am unable either to admit or deny it." [For convenience, I will characterize this as "insufficient knowledge" in later questions.] | Admits |
| The pulse rate of Anna Lanzet dropped from 65 to 40 at 11:20 a.m. | Admits | | Denies |
| The cardiac monitor attached to Anna Lanzet during the eye surgery on August 29, 1983 made an audible beep at each heart beat | Admits | Denies | Denies |
| The anesthesiologist was announcing changes in the condition of Anna Lanzet during the surgery of August 29, 1983 as they were occurring | Admits | Denies | Denies |
| Anna Lanzet stopped breathing on the operating table on August 29, 1983 | Admits | Denies | Denies |
| The cataract surgery to Anna Lanzet concluded at 11:40 a.m. on August 29, 1983 | Admits | Insufficient knowledge | Admits |

| REQUEST FOR ADMISSION | RESPONSES | | |
| --- | --- | --- | --- |
| | Dr. Bekhit | Dr. Greenberg | Dr. Scannapiego |
| [You] observed that Anna Lanzet was cyanotic [blue discoloration attributable to loss of oxygen] after the operation was completed. | Admits | Denies | Denies |
| A code was called at 11:40 a.m. on August 29, 1983 | Admits | Insufficient knowledge | |
| Anna Lanzet was not breathing when CPR began on August 29, 1983 | Admits | | Denies |

Even at trial there seemed to be regrettable confusion about who was responsible for the patient's welfare. When each of the physician-defendants appeared to point the finger of blame at the others, it led the jury to the inevitable conclusion that each of the physicians had failed in his or her responsibility to attend to the patient. Dr. Bekhit, the anesthesiologist, said that he had continually informed the surgeons of the patient's condition, and that it was the "surgeon's decision [to stop the operation], but my opinion, if he asks my opinion * * * I will give him the answer." In contrast, Dr. Scannapiego, the assistant surgeon, said that the anesthesiologist, Dr. Bekhit, had been in charge of "when the surgery can proceed" and that when it came to stopping the operation, "the anesthesiologist was in charge."

The testimony of the doctors widely conflicted with respect to the awareness of the patient's life signs. Recall that Dr. Hein had said that everyone would know what the beeps meant. Yet Dr. Greenberg, at his deposition, said: "No one ever mentioned or requested me to stop the operation or made me aware of any specific problems during the operation." Dr. Scannapiego was asked:

Q. Do you know if her heart rate had dropped during the operation?

A. I do not.
Q. Would you have been aware of that if that had occurred?
A. No.

Yet Dr. Bekhit insisted that he had continually informed the surgeons of the patient's condition, telling them that "the heart rate is falling," that between 11:35 and 11:40, "I was telling [the surgeons] what the signs were," and at another time, "I didn't ask [Dr. Greenberg] to stop the operation, I just informed him of the situation so he can evaluate in his own mind as well."

There were sharp conflicts in the physicians' testimony with respect to how long the patient had been deprived of oxygen. Dr. Bekhit, who on one occasion misunderstood the medical expression cyanotic for cyanide, stated that when he threw off the drape, the patient was cyanotic, which means that oxygen deprivation caused blue discoloration of her skin and fingernail beds, and that in addition she was sweating. At some times Dr. Bekhit said it was "a matter of seconds [before] she became cyanotic." In contrast, Dr. Scannapiego said that it is "closer to minutes" before skin tissue becomes cyanotic, suggesting that the patient had been deprived of oxygen for minutes. Dr. Bekhit admitted at other times that if the lungs were filled with oxygen, the brain would be damaged with "five or six minutes loss of oxygen."

Finally, although the following examples may be but poor choices of words by the physicians, they might well have conveyed to the jury an attitude of indifference. When Dr. Greenberg was asked if he had been concerned about the patient's blood pressure, he said, "Well, it's outside my province what her blood pressure was. I couldn't have done anything about it and I wasn't able to examine it." When Dr. Bekhit was questioned on why he had not changed the treatment between 11:35 and 11:40 when the patient had not been responding to the Atropine, he responded, "I just give the treatment and hope for the best." And Dr. Scannapiego used an unfortunate example to disabuse the jury of concern about the pa-

tient's declining heart rate, stating, "If it was an athletic person, a slowed heart rate doesn't mean that much." But the jury surely knew that Mrs. Lanzet was not an athlete. At the age of sixty-five she weighed 340 pounds and stood 5'6". She had been diagnosed before the operation as showing signs of "congestive heart failure." In addition, she displayed "edema of the ankles," a "sign of one of the many forms of heart failure."

Although the foregoing are only isolated pieces of testimony in a long and very complex trial, the underlying fundamental issue was neither complex nor beyond the ken of a jury. It is almost paradoxical that had Mrs. Lanzet suffered her heart episode in other circumstances, those around her might have rushed immediately to administer cardiopulmonary resuscitation, but when stricken on the operating table, aid was too long delayed, rendering the damage to her brain irreversible. She seems to have had her heart attack in the wrong place and at the wrong time.

This is not a case like *Whitfield v. Blackwood,* 101 *N.J.* 500, 502 *A.*2d 1132 (1986), in which the medical malpractice involved a highly complicated question of whether a nerve had been cut in the course of surgery. There was no question here with respect to the technical proficiency of the eye surgery. This case rather came down to the simple question of whether the operating-room physicians had closely attended to their patient, particularly whether they had responded to her failing vital signs. Each of the defense counsel focused on the highly complex issues in the case, such as whether a vagal nerve response had caused the heart rate to decline, or whether there had been a mechanical blockage of the heart, or whether it had been appropriate to treat Mrs. Lanzet with the incremental doses of Atropine in an attempt to stabilize her heart condition. The case was extraordinarily well-tried by the defense team, but the jury did not buy the defense. The jury was left to decide the one simple proposition accepted by Dr. Hein, the

defense expert: whether the doctors were "aware of the patient's needs."

## IV

The Appellate Division set aside the verdict against Dr. Oen, the internist, because of what it described as a "net opinion" lacking in factual basis. The Appellate Division found that plaintiff had failed to show that the negligent clearance of the patient for surgery was causally related to the "cerebral-vascular accident which later occurred." 243 *N.J.Super.* at 227, 579 *A.*2d 309. But plaintiff need not establish that any of the doctors caused the "cerebral-vascular accident." They may be held liable for decreasing her chances to survive such an incident without devastating brain damage. *See Evers v. Dollinger*, 95 *N.J.* 399, 471 *A.*2d 405 (1984) (describing the "increased risk" principle). Those principles were recently reaffirmed in *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1990), and *Olah v. Slobodian*, 119 *N.J.* 119, 574 *A.*2d 411 (1990). Although the case against Dr. Oen was not as strong as that against the operating-room physicians, the proofs allowed the jury to infer that Dr. Oen's failure to consult with the radiologist and to realize that "this is not a normal conducting system of the heart" was in reasonable probability a factor that further contributed to the patient's failure to withstand the heart episode when it occurred on the operating table.

With respect to Dr. Bekhit, the Appellate Division emphasized a lack of a standard with respect to the use of Atropine versus Isuprel to restore the patient's heart rate, saying "a physician must be allowed a wide range in the reasonable exercise of judgment." 243 *N.J.Super.* at 230, 579 *A.*2d 309. However, that analysis overlooks the more fundamental failure on his part, noted previously, even to know who was to stop the operation when the patient's condition called for it.

Finally, with respect to the two operating surgeons, the Appellate Division found itself unable to "determine from the

testimony in what respect Drs. Greenberg and Scannapiego failed to 'communicate' with the other operating room personnel and the proximate consequences of such failure to communicate." *Id.* at 231, 579 *A.*2d 309. But there was evidence that both the circulating nurse and the anesthesiologist had alerted the surgeons to the "serious" condition of the patient at 11:35 a.m. Dr. Bekhit, the anesthesiologist, even said, "I did suggest [to the surgeons] stopping the operation." Still the operation continued for five more minutes while the patient's heart rate continued to decline. No jury would have difficulty in finding that there was some failure to "communicate" in that circumstance.

■■ In short, there was more than enough evidence in this case to sustain a jury finding of deviation. The "net opinion" rule, that experts' bare conclusions unsupported by factual evidence are inadmissible, *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981), does not invalidate the verdict. *Evidence Rule* 56(2) provides that a witness qualified pursuant to *Evidence Rule* 19 as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion concerning matters requiring scientific, technical, or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. The facts or data on which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. In our recently-decided *Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 579 *A.*2d 1241 (1990), we noted that the primary function of courts is to determine the admissibility of evidence, not its reliability. *See James v. City of East Orange,* 246 *N.J.Super.* 554, 588 *A.*2d 412 (App.Div.1991) (once competency of medical expert has been established, the jury is "to determine the credibility, weight and probative value of the expert's testimony").

Of course some evidence is inherently scientifically unreliable. An example is the opinion given by an expert who attrib-

utes cancer to moonbeams but points to no scientific authority whatsoever in support of that theory. *See State v. Cavallo,* 88 *N.J.* 508, 524–26, 443 *A.*2d 1020 (1982) (psychiatric testimony on mental characteristics of rapists held inadmissible because insufficiently reliable). The issue in *Cavallo,* however, was the reliability of the testimony itself, *i.e.,* whether anyone can determine that any person has the distinctive psychological traits of a rapist. That type of case is far different from this case. Whatever we might think of Dr. Stark's testimony, he had sufficient qualifications to present the issue to the jury, and the questions about the foundations for his opinions were properly for the jury to decide.

In addition, as we have noted, we must give credence to all the testimony in this case, not just Dr. Stark's or Dr. Hein's, and we cannot escape that there is a factual issue of deviation. Dr. Bekhit, whom the surgeons described as the one in charge of deciding when the operation would stop, testified that he had suggested to the surgeons that they stop the operation. The surgeons denied having heard that suggestion. The operation had continued for several minutes after that advice. Surely that conflict in testimony presents a question of fact concerning the physicians' neglect that no appellate court can resolve.

## V

Applying the mechanical test that we must when we review jury verdicts, we cannot fairly say that giving all the favorable inferences to the party postulating the proofs, there was not at the very least a misunderstanding about whose role it was to terminate this operation, leading to inattention to the patient's needs. We need not resolve the technical questions of whether three doses of Atropine were proper under the circumstances or whether the vagal nerve behind the eye, when affected by the anesthesia, had the effect of slowing the heart rate. Ultimately, the jury was presented with what was really a quite simple case. As one of the defense counsel said, "this

case isn't about a heck of a lot." There was evidence of a five-minute delay during which the patient's vital signs had continued to decline. The anesthesiologist said that he had informed the surgeons of that declining heart rate of the patient, whom all agreed they were to monitor carefully. One defendant's expert conceded that if all of the postulated facts had existed and if earlier intervention had occurred, the injury might have been averted. That is all that is needed to present a jury question.

What was missing, however, from this case was the correct theory of liability. It was incorrect to ask the jury whether all of the harm that befell the patient was attributable to the physician-defendants. The correct instruction, not sought by the parties, was one that would require the jury to determine whether the physicians' neglect increased the risk of harm to the patient and whether that increased risk was a substantial factor in producing her injuries. *Evers v. Dollinger, supra,* 95 *N.J.* 399, 471 *A.*2d 405. We have the inestimable benefit of hindsight in assessing the merits of this case. In our 1990 decisions in *Scafidi v. Seiler, supra,* 119 *N.J.* 93, 574 *A.*2d 398, and *Olah v. Slobodian, supra,* 119 *N.J.* 119, 574 *A.*2d 411, we prospectively limited recovery in such circumstances to the value of the "lost chance" attributable to the physician's neglect.

This case illustrates, however, the complexities of presenting medical causation issues to a jury when there is a preexisting condition. Just as we believe that plaintiff's case did not fail because she could not prove that the physicians' neglect had caused the heart failure, her case also did not fail because she did not establish to a certainty that the prompt commencement of resuscitative measures by the physicians would have necessarily saved the patient's life or brain. The fact that Dr. Stark agreed that despite best efforts, there was always a "remote possibility" that she could not have been saved, does not mean that an effort to save her should not have been timely made. It is sufficient in law that she was deprived of the chance.

Obviously, many patients suffer from disease that threatens their well-being. In that circumstance, the "substantial-factor test of causation requires the jury to determine whether the deviation, in the context of the patient's preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Battenfeld v. Gregory*, 247 *N.J.Super.* 538, 547, 589 *A.*2d 1059 (App.Div.1991) (citing *Scafidi v. Seiler, supra*, 119 *N.J.* at 109, 574 *A.*2d 398). In this setting, too, the superior knowledge of the physician requires that he or she distinguish the preexisting condition from the eventual harm caused. *Fosgate v. Corona*, 66 *N.J.* 268, 330 *A.*2d 355 (1974), *cited in Scafidi v. Seiler, supra*, 119 *N.J.* at 97, 574 *A.*2d 398.

We also note that in its charge to the jury the court below seemingly limited the jury's consideration of deviation to the testimony of Dr. Stark and Dr. Hein. The court instructed the jury:

Jurors normally cannot know what conduct constitutes the standard medical practice. Therefore, the standard of practice by which a physician's conduct is to be judged must be furnished by the expert testimony, that is to say, by the testimony of a person or persons who by knowledge, training and experience are deemed qualified to testify and to express their opinions on medical subjects.

You, as Jurors, should not speculate or guess about the standards by which the Defendant physicians should have conducted themselves in treatment of Anna Lanzet. Rather, you must determine the applicable medical standard from the testimony of the expert witnesses you have heard in this case.

\* \* \* \* \* \* \* \*

In determining the credibility of an expert you are entitled to consider the demeanor of the witnesses as they testified;—you observed the witnesses who testified, Dr. Hein, Dr. Stark; you sized them up; you listened to them carefully—their manner of testifying; their appearance; their ability to recall events; the likelihood of a witness making a particular note or recalling the particular detail. You are also entitled to consider the contraindications, if any, of an expert witness and the interest which the witness may have in the outcome of this lawsuit.

\* \* \* \* \* \* \* \*

Now, you've heard the testimony of experts; Dr. David Stark, an anesthesiologist, for the Plaintiff; * * * and Dr. Herbert F. Hein, ophthalmologist. I pause to mention their names as a preface to what I'm going to charge you.

## The court then proceeded to charge on proximate cause:

So, if the Plaintiff is to prevail—these are two pronged—the Plaintiff must prove by a preponderance of the credible evidence that: The Defendant was negligent, and; number two, that such negligence was a proximate cause of the damage or injuries alleged.

I now define for you in greater detail what we mean by a proximate cause of injury or damage.

By proximate cause is meant that the negligence of one or more of the Defendant physicians was an efficient cause of the occurrence, that is, what happened in the—the occurrence, I mean, so there's no misunderstanding, what transpired in the operating room on the morning of August 29, 1983.

By an efficient cause is meant a cause which necessarily sets other causes in motion and was a substantial factor in bringing about the injury or damage.

Proximate cause is defined as the cause which—a cause which naturally and probably led to and might have been expected to produce the occurrence complained of.

When the negligence of two or more persons combines to produce an injury and damages to another, the parties concurring—you know, concurring means going on at the same time—in such negligence in bringing about the results are jointly and severally—that means each one and jointly—liable for the injury caused thereby.

If you find that the concurring negligence of two or more of the Defendant physicians proximately—that means directly—was an efficient cause, a substantial factor in bringing about the injury, each is liable to the Plaintiff regardless of the relative degree to which each contributed to the injury.

Our law attaches liability not only to the dominating cause, but also to any cause which constitutes at any event a substantial factor in bringing about the injury.

The law provides that if a person is injured by the negligence of two or more persons acting independently, but concurrently, in causing the injury, each of the wrongdoers is liable to such injured person for the full amount of the damages.

Much of the unease about the verdict exhibited by the Appellate Division panel and by the members of our Court may stem from this narrowed focus given to the jury. Absent the increased-risk charge of *Evers v. Dollinger, supra,* 95 *N.J.* 399, 471 *A.*2d 405, not only was the jury told to make an all-or-nothing judgment about the doctors' culpability, but in theory it was directed not to consider as proof of deviation all of the items of evidence that we may consider in assessing the record

of a trial. Proof of deviation elicited from the defendants themselves, because they are competent professionals, could be relied on by the jury. *Rogotzki v. Schept*, 91 *N.J.Super.* 135, 148–49, 219 *A.*2d 426 (App.Div.1966); *Lawless v. Calaway*, 24 *Cal.*2d 81, 90–92, 147 *P.*2d 604, 609 (1944).

We have no doubt that a properly charged jury could make the factual judgment that even within the narrow window of time on the operating table there had been a deviation from accepted medical standards. A much closer question is the fair allocation of responsibility for what ensued.

The absence of that focus in the jury charge leaves us with a sense that the only fair solution is that this case be tried again. Although the case passes muster under the "rather mechanical" test of *Rule* 4:40–2, an indefinable sense that there may have been a miscarriage of justice in laying all of Anna Lanzet's misfortunes at the feet of these physicians warrants a retrial of the case. *See Gaido v. Weiser*, 115 *N.J.* 310, 311, 558 *A.*2d 845 (1989) (Court declined to invoke "plain error" basis to set aside jury verdict, finding no showing that "substantial justice" has not been done).

Courts have struggled in these highly complex cases of medical causation, and we have considered whether we should exercise a greater supervisory role. *See Frame v. Kothari*, 115 *N.J.* 638, 651–53, 560 *A.*2d 675 (1989) (Wilentz, C.J., and Garibaldi, J., concurring); *see also* Note, *Taking the Tort Out of Court—Administrative Adjudication of Medical Liability Claims: Is It the Next Step?*, 20 *Sw.U.L.Rev.* 41 (1991) (recommending administrative system as alternative to judiciary to ease medical-liability crisis). There are no easy answers in this field. National concerns have prompted the present administration to suggest to Congress a system of revamping professional medical-malpractice claims. N.Y. Times, May 13, 1991, at A1, col. 1. In the meantime, all must strive for a just and balanced resolution of the interests of care providers and the patient

community. In the circumstances of this case, that process of resolution must be attempted anew.

## VI

Plaintiff argues, in addition, that the law-of-the-case doctrine precluded reconsideration of liability by the second Appellate Division panel. We disagree. Under the law-of-the-case doctrine, decisions of law made in a case should be respected by all other lower or equal courts during the pendency of that case. *State v. Reldan,* 100 *N.J.* 187, 203, 495 *A.*2d 76 (1985); *State v. Hale,* 127 *N.J.Super.* 407, 410–11, 317 *A.*2d 731 (App.Div.1974). Plaintiff asserts that the first Appellate Division denial of leave to appeal became the law of the case on liability. For the determination of an issue to constitute the law of the case, however, the issue must have been contested and decided. *Reldan, supra,* 100 *N.J.* at 204, 495 *A.*2d 76. A denial of leave to appeal does not satisfy those requirements. Courts frequently deny interlocutory appeals "for practical or other reasons which have nothing to do with the merits." *Campbell v. Schlaifer,* 88 *N.J.Super.* 66, 68, 210 *A.*2d 781 (App.Div.1965). Thus, the court below did not violate the law-of-the-case doctrine by considering the issue of defendants' liability. It may be, however, that our current interlocutory-appeal practice, which permits partial retrial of damage claims with liability issues outstanding, should be reconsidered in the context of complex cases (of which medical malpractice would surely be one type). Our Civil Practice Committee may wish to consider such a change.

## VII

To sum up, there was clear evidence of neglect by the attending physicians in this case. The issue cannot be avoided or confused by speaking, as the dissent does, of the necessity of a "concrete factual explanation to support a finding that physicians have deviated from accepted medical standards, and that

the deviation proximately caused the plaintiff's injury." *Post* at 196, 594 *A*.2d at 1324. That standard was more than met here. In fact, the "concrete factual explanation" came from the mouths of the defendants themselves.

The real issue in this case, then, is the constitutional office of the jury under our system of justice. While yet a young judge, Justice Brennan reflected on the two standards to be invoked in reviewing cases involving issues of fact determined by the verdict of a jury. He wrote: " 'The appellate tribunal cannot invade the constitutional office of the jury; it may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury.' " *Murphy v. Terzako*, 14 *N.J.Super.* 254, 260, 82 *A*.2d 1 (App.Div.1951) (quoting *Hager v. Weber*, 7 *N.J.* 201, 81 *A*.2d 155 (1951)). This Court would be substituting its own judgment for that of the jury if it were to dismiss plaintiff's case.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for further proceedings in accordance with this opinion.

POLLOCK, J., dissenting.

The majority opinion is a result in search of a rationale. In a system designed to provide litigants with one opportunity to prove their case, the majority provides plaintiff with a second chance. This, despite her failure at trial to prove a prima facie case against any of the defendants and despite "the scattershot approach that plaintiff took to assessing liability against the defendant physicians," *ante* at 175, 594 *A*.2d at 1313, and the absence of what the majority has constructed as "the correct theory of liability," *ante* at 188, 594 *A*.2d at 1320. The general rule in medical malpractice cases has long been that a plaintiff must establish through expert testimony the relevant standard of care, the doctor's breach of that standard, and a causal connection between the breach and the plaintiff's injuries. Furthermore, the testimony could not be a bare conclusion or "net

opinion" unsupported by facts or reasons. As I read the majority opinion, it ignores those requirements and distorts the facts to circumvent the judgment of the Appellate Division. Consequently, I dissent.

I

This case comes to us, in relevant part, on appeal from a denial of a motion for a judgment notwithstanding the verdict. Judgment notwithstanding the verdict under *Rule* 4:40-2, like involuntary dismissal under *Rule* 4:37-2(b), must be denied "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." *R.* 4:37-2(b); *see* Pressler, *Current N.J. Court Rules,* Comment *R.* 4:40-2 (1991). It is to be granted only if, under the applicable legal principles, reasonable minds could not differ. *Dolson v. Anastasia,* 55 *N.J.* 2, 5-6, 258 *A.*2d 706 (1969). A case should go to the jury, and a jury verdict should stand, unless the law clearly requires otherwise. We agree with the majority, *ante* at 181, 594 *A.*2d at 1316, that a jury is better situated than are we to assess the credibility of witnesses. The majority's point, however, begs the question, which is whether the evidence justified submission of the case to the jury. In brief, the question is whether plaintiff proved a prima facie case.

I therefore turn to the question of the requisite expert testimony for establishing a prima facie case of medical malpractice. Lay testimony generally does not suffice in medical malpractice actions. As we explained in *Schueler v. Strelinger,* 43 *N.J.* 330, 345, 204 *A.*2d 577 (1964),

[w]ith rare exceptions (and this case is not one of them), evidence of a deviation from accepted medical standards must be provided by competent and qualified physicians. Ordinarily a jury of laymen cannot be allowed to speculate as to whether the procedure followed by a treating physician conformed to the required professional standards. Since there was no competent proof in this instance [that there was such a deviation], application of the above principles called for withholding the question from jury consideration.

The rationale is that jurors lack the technical training and experience needed to evaluate physicians' professional conduct.

*Sanzari v. Rosenfeld,* 34 *N.J.* 128, 134–35, 167 *A.*2d 625 (1961). To establish a prima facie case of negligence in a medical malpractice action, a plaintiff must present expert testimony to establish (1) the applicable standard of care, *Rosenberg by Rosenberg v. Cahill,* 99 *N.J.* 318, 325, 492 *A.*2d 371 (1985); *Sanzari, supra,* 34 *N.J.* at 134–35, 167 *A.*2d 625; *Hearon v. Burdette Tomlin Memorial Hosp.,* 213 *N.J.Super.* 98, 101–02, 516 *A.*2d 628 (App.Div.1986); *Parker v. Goldstein,* 78 *N.J.Super.* 472, 479–80, 189 *A.*2d 441 (App.Div.), *certif. denied,* 40 *N.J.* 225, 191 *A.*2d 63 (1963); (2) a deviation from that standard, *Clark v. Wichman,* 72 *N.J.Super.* 486, 496, 179 *A.*2d 38 (App. Div.1962); and (3) that the deviation proximately caused injury, *Germann v. Matriss,* 55 *N.J.* 193, 205, 208, 260 *A.*2d 825 (1970); *Clark, supra,* 72 *N.J.Super.* at 498, 179 *A.*2d 38. Absent competent expert proof of these three elements, the case is not sufficient for determination by the jury. *Sanzari, supra,* 34 *N.J.* at 135, 167 *A.*2d 625; *Parker, supra,* 78 *N.J.Super.* at 484, 189 *A.*2d 441; *Clark, supra,* 72 *N.J.Super.* at 497, 179 *A.*2d 38.

Perhaps the majority opinion is best understood as an emotional response to a tragic event. When a medical procedure produces a bad result, a reviewing court may be tempted to close its eyes to legal requirements and sustain a judgment for money damages. When so tempted, however, a court must remind itself that defendants, as well as plaintiffs, are entitled to a fair hearing and that plaintiffs must satisfy evidentiary requirements to justify submission of their case to the jury.

The requirement for expert testimony in medical malpractice cases ensures that jurors will reach a reasoned judgment, not one resulting from mere sympathy. A bare conclusion unsupported by an adequate explanation, commonly called a "net opinion," does not suffice. *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981); *Parker, supra,* 78 *N.J.Super.* at 483–84, 189 *A.*2d 441. In fact, an expert's bare conclusions, unsupported by factual evidence, are inadmissible. *Johnson v. Salem Corp.,* 97 *N.J.* 78, 91, 477 *A.*2d 1246 (1984); *Buckelew, supra,* 87 *N.J.* at 524, 435 *A.*2d 1150. The expert must offer a

concrete factual explanation to support a finding that physicians have deviated from accepted medical standards, and that the deviation proximately caused the plaintiff's injury. *Parker, supra,* 78 *N.J.Super.* at 483–84, 189 *A.*2d 441. Expert opinion in a medical malpractice case is not an empty liturgy, but a means of supplying a jury with the information to decide the case. "The sole justification and purpose of expert testimony is to assist the trier of fact to find a solid path through an unfamiliar and esoteric field." *Thompson by Thompson v. Merrell Dow Pharmaceuticals,* 229 *N.J.Super.* 230, 241, 551 *A.*2d 177 (App.Div.1988) (quoting *Tabatchnik v. G.D. Searle & Co.,* 67 *F.R.D.* 49, 55 (D.N.J.1975)).

Regarding the applicable standard of care, "[a] physician must be allowed a wide range in the reasonable exercise of judgment." *Schueler, supra,* 43 *N.J.* at 345, 204 *A.*2d 577.

The law recognizes that medicine is not an exact science. Consequently it does not make the physician a guarantor of the cure of his patient. When he takes a case it imposes upon him the duty to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. [*Id.* at 344, 204 *A.*2d 577.]

Moreover, a deviation from that standard may not be assumed from a tragic result.

The fact that a good result may occur with poor treatment, and that good treatment will not necessarily prevent a poor result must be recognized. So, if the doctor has brought the requisite degree of care and skill to his patient, he is not liable simply because of failure to cure or for bad results that may follow. [*Ibid.* ]

In addition to establishing the relevant standard of care and a defendant's breach of that standard, the plaintiff must also establish causation. *Germann, supra,* 55 *N.J.* at 208, 260 *A.*2d 825. Without such proof, the plaintiff has not proved a prima facie case. *Id.* at 205, 260 *A.*2d 825.

In rare cases, a plaintiff may prove malpractice without expert testimony. Under the "common knowledge" exception, expert testimony is not required when the standard of care, deviation, and causal link may be readily understood in light of the common knowledge and experience of laypersons. *E.g.,*

*Klimko v. Rose,* 84 *N.J.* 496, 503–05, 422 *A.*2d 418 (1980) (chiropractor continued neck adjustments after patient became dizzy, sweaty, and gray); *Calabrese v. Trenton State College,* 82 *N.J.* 321, 324, 413 *A.*2d 315 (1980) (physicians gave no warning of rabies vaccine's possible adverse effects); *Jenoff v. Gleason,* 215 *N.J.Super.* 349, 357–59, 521 *A.*2d 1323 (App.Div. 1987) (radiologist failed immediately to advise treating physician of possible lung tumor detected on x-ray); *Tramutola v. Bortone,* 118 *N.J.Super.* 503, 512–13, 288 *A.*2d 863 (App.Div. 1972) (physician failed to inform patient of needle left in her chest during surgery), *modified on other grounds,* 63 *N.J.* 9, 304 *A.*2d 197 (1973); *Jones v. Stess,* 111 *N.J.Super.* 283, 287–90, 268 *A.*2d 292 (App.Div.1970) (chiropodist accidentally cut diabetic's toe); *Steinke v. Bell,* 32 *N.J.Super.* 67, 70, 107 *A.*2d 825 (App.Div.1954) (dentist extracted wrong tooth). The common knowledge doctrine, however, applies only in extraordinary cases, and has no application here. *See Rosenberg by Rosenberg, supra,* 99 *N.J.* at 325–27, 492 *A.*2d 371. Generally, a prima facie case of medical malpractice requires adequate particularized expert testimony.

## II

Given these legal principles, the question becomes whether, as to each defendant, plaintiff proved (1) a standard of care, (2) a deviation from that standard, and (3) a causal link between that deviation and the injury. Examining the testimony of plaintiff's sole expert witness, Dr. David Stark, an anesthesiologist, and all the other evidence presented, I conclude, as did the Appellate Division, that plaintiff's evidence was deficient as to each of the defendants. I cannot improve on Judge Antell's perceptive analysis of those deficiencies:

### DR. OEN

Dr. Oen's negligence, according to Dr. Stark, lay in her failure to make a bedside reassessment of the patient after she learned of the patient's elevated blood pressure before clearing her for surgery. When asked if he had an

opinion whether or not Dr. Oen "deviated from medically acceptable standards in not reassessing Anna Lanzet for surgery on the morning of October 29, 1983," he answered:

> Yes, that is my opinion. I think that if—as I said before, having with regard to the fact that on the morning of the surgery it is necessary to have additional medical consultation and to prescribe important diuretics over the telephone, I think it is a basis on which bedside assessment and reassessment would very well have resulted in a happier outcome.

The answer given is simply a "net opinion" or a statement of the doctor's own personal opinion as to what good medical practice dictated under the circumstances without any attempt to demonstrate how the lack of a bedside reassessment was a factor causative to the patient's injury and death. The statement that a reassessment would have produced a "happier outcome" does not satisfy the need for an explanation in concrete terms of what a bedside reassessment would have accomplished or what findings would reasonably have been made that could be related to what later happened on the operating table. Indeed, we come back to Dr. Stark's testimony that what befell Mrs. Lanzet was probably caused by a cerebral-vascular accident, something which was neither shown to be foreseeable nor related in any way to the surgical procedure in progress. Absent from the record is any statement of the physiological mechanics which intervened between Dr. Oen's telephoned prescription for Lasix on the morning of the surgery and the disastrous events on the operating table.

In *Parker v. Goldstein*, 78 *N.J.Super.* 472 [189 *A.2d* 441] (App.Div.), certif. den. 40 *N.J.* 225 [191 *A.2d* 63] (1963), an obstetrician was held answerable by a jury for the death of a patient which was caused by a pulmonary embolism during childbirth. The theory of recovery was that the doctor's delay in performing a Caesarean section bore a causal relationship to the embolism. The Appellate Division reversed because proof of causal relationship was absent. The court there stated:

> There was no word of testimony from the [expert] witness to explain the physiological reactions of the decedent to the alleged delay, or of the anatomical effect of the delay on the pulmonary structure of decedent. The opinion, thus, was what is commonly described as a "net opinion." [*Id.* 78 *N.J.Super.* at 483, 189 *A.2d* 441].

It therefore concluded that the

> "complete absence of explanation ... of how, and in what manner, the supposed delay caused or contributed to the pulmonary embolism left an irreparable void in plaintiff's proof. Acceptable medical opinion of causation supported by expert explanation was an integral and indispensable part of plaintiff's case. [*Id.* at 484, 189 *A.2d* 441].

The fault attributed to Dr. Oen by Dr. Stark was that she cleared the decedent for surgery. As we have noted, the surgery was not responsible for the cerebral-vascular accident which later occurred. Therefore, the only effect of cancelling the surgery would have been that Mrs. Lanzet would have suffered the accident at a place other than in the operating room. Her pulse was dropping rapidly, she was showing cyanosis, her brain had become globally

hypoxic and without the resuscitative efforts which were made at 11:40 a.m., she would probably have been denied the 13 months of vegetative existence following the operation.

\* \* \* \* \* \* \* \*

We conclude that the finding of professional negligence on the part of Dr. Oen which was causally related to the decedent's injury is not supported by the evidence. [243 *N.J.Super.* at 225–27, 579 *A.*2d 309.]

In sum, plaintiff alleges that the internist, Dr. Oen, committed malpractice by clearing Mrs. Lanzet for surgery on the morning of the operation without conducting a bedside reassessment. Dr. Stark testified that in his opinion, Dr. Oen "deviated from medically acceptable standards" by failing to make such a reassessment after learning of the patient's elevated blood pressure. He further testified that, in his opinion, "bedside assessment and reassessment would very well have resulted in a happier outcome." However, Dr. Stark gave no factual explanation to guide a jury in finding a causal link between deviation and injury. "Acceptable medical opinion of causation supported by expert explanation was an integral and indispensable part of plaintiff's case." *Parker, supra,* 78 *N.J.Super.* at 484, 189 *A.*2d 441. In the absence of proof of causation, plaintiff did not establish a prima facie case against Dr. Oen.

Plaintiff also argues that Dr. Oen should have consulted with the radiologist regarding the x-ray prior to clearing the patient for surgery. However, Dr. Stark's vague statement that "I think it's—it's sound to consult if you feel there's a disagreement" establishes neither a deviation from accepted medical standards nor a causal link between the failure to consult and the injurious outcome. Because plaintiff failed to present sufficient expert testimony to make out a prima facie case, I agree with the Appellate Division that Dr. Oen was entitled to a judgment notwithstanding the verdict.

The majority's argument for reinstating the verdict against Dr. Oen is incomprehensible. The majority states that "plaintiff need not establish that any of the doctors caused the

'cerebral-vascular accident.' They may be held liable for decreasing her chances to survive such an incident without devastating brain damage." *Ante* at 185, 594 *A.*2d at 1318. Unexplained by the majority, and I believe unexplainable, is how Dr. Oen's conduct decreased Anna's chances to survive the accident without brain damage. I cannot make any sense of the majority's declaration that

> the proofs allowed the jury to infer that Dr. Oen's failure to consult with the radiologist and to realize that "this is not a normal conducting system of the heart" was in reasonable probability a factor that further contributed to the patient's inability to withstand the heart episode when it occurred on the operating table. [*Id.* at 185, 594 *A.*2d at 1318.]

If the majority's theory is that Dr. Oen's conduct was not causally related to the cerebral-vascular accident, but only to the patient's inability to undergo surgery, then the majority must think something shows a causal link between the doctor's conduct and that inability. Any such evidence, however, is missing from the record. Nothing suggests that Dr. Oen's conduct "contribut[ed] to plaintiff's inability to withstand the heart episode when it occurred on the operating table."

Concerning the anesthesiologist, Dr. Bekhit, plaintiff's case is also deficient. Judge Antell analyzed the relevant facts:

## DR. BEKHIT

Dr. Stark testified that Dr. Bekhit's treatment of the bradycardia was "appropriate" until after the second administration of Atropine at 11:36 a.m. At that point, he says, Dr. Bekhit should have investigated the cause of the bradycardia, made a "more active assessment" of the plaintiff's condition and considered using another medication to stimulate the heart.

The function of Atropine is to block the vagus nerve. When stimulated, the vagus nerve, which lies directly behind the eye, will have the effect of slowing the heartbeat. And Dr. Stark said, Atropine is a commonly used drug that increases the pulse rate in most cases. Apparently, the Atropine had its desired effect with the first administration at 11:20 a.m. However, after the administration at 11:36 a.m. failed to achieve a response Dr. Stark says Dr. Bekhit should have considered that there was "... something adrift further down in the pumping mechanism." The "treatments of choice" open to Dr. Bekhit were either to continue with the Atropine or switch to another drug, such as Ephedrine or Isuprel, which directly stimulate the heart muscle. If the drug

had been changed, according to Dr. Stark, the cardiac arrest would have been brought under control and the global hypoxia averted.

Dr. Stark said that Dr. Bekhit should have recognized as a warning sign the fact that the first Atropine administration at 11:20 a.m. elicited only a "modest" response by bringing the pulse up to just below 60. He stated that in most cases the pulse rate after such a dose would have increased to 80 or 90. Thus, he stated, the third dose, which was administered between 11:36 and 11:37 a.m., was not "appropriate."

Dr. Stark did not testify that recognized medical standards controlled the decision to continue the administration of Atropine or change to Isuprel or Ephedrine. Although he said that a more "active assessment" should have been made, he did not specify what form this should have taken, what course of action would have resulted from it, and, most important, when in the sequence of events recognized medical standards required the change to Isuprel or Ephedrine. In fact, he acknowledged on cross-examination that there was "no obligatory standard that compelled the use of something besides Atropine," and actually said no more than that the use of another drug was "one of the options." He also acknowledged the possibility that in such situations catastrophe can be caused "unnecessarily by over-intervening too soon." Writing on this subject in his own book on anesthesia, he wrote: "It may be wise merely to watch the situation here carefully. It is all too easy to over treat in these circumstances."

We observe that even on cross-examination Dr. Stark carefully avoided ratifying the phrase "standard of practice" when used by counsel to determine whether or not Dr. Bekhit's course of treatment was negligent. He chose instead to characterize the treatment in terms of whether it was or was not "appropriate."

[M]uch more than the personal opinion of a medical witness is necessary to establish a standard of acceptable medical practice. The expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness. *See Carbone v. Warburton,* 11 *N.J.* 418, 425 [94 *A.*2d 680] (1953). *See also, Schueler v. Strelinger,* 43 *N.J.* 330, 346 [204 *A.*2d 577] (1964). [*Fernandez v. Baruch,* 52 *N.J.* 127, 131, 244 *A.*2d 109 (1968)].

We conclude that Dr. Stark's testimony falls significantly short of establishing the required standard of medical practice to determine whether Dr. Bekhit exercised due care. Under the circumstances the doctor's choice of treatment involved the exercise of medical judgment only. In Dr. Stark's opinion, the "inappropriate" treatment occurred between 11:36 a.m., when the third administration of Atropine was given, and 11:40 a.m., when resuscitation began. In Dr. Bekhit's judgment the proper treatment of choice was a third administration of Atropine which was given between 11:36 and 11:37 a.m., although when the resuscitative effort began he was preparing to administer Isuprel. Taking into account that a minute or two was required for the Atropine to take effect, to say in retrospect that a different drug, or earlier resuscitative efforts, would have saved the patient does not equate with an expert opinion that Dr. Bekhit's failure to resort to those measures before 11:40 a.m. constituted a deviation from medical standards. We can only interpret Dr. Stark's testimony to mean

that the choice of medication, and the decision when to change from one to another, must be left to the trained judgment of the anesthesiologist responsible for the patient's care and whose allotted time for decision must be measured in fractions of a minute. Although Dr. Stark might have earlier utilized a different treatment, this does not serve as a standard by which to measure Dr. Bekhit's performance and conclude that his judgment was not responsibly exercised. "A physician must be allowed a wide range in the reasonable exercise of judgment." *Schueler v. Strelinger,* 43 *N.J.* at 345 [204 *A.*2d 577]. The fact that the patient was not saved does not evidence negligence. *Id.* at 344 [204 *A.*2d 577]. [243 *N.J.Super.* at 228–30, 579 *A.*2d 309.]

Plaintiff thus alleges that when Atropine failed to increase the patient's pulse rate, Dr. Bekhit should have switched to another treatment. Dr. Stark testified that another drug might have prevented the global hypoxia by raising the pulse rate, and that Dr. Bekhit's third administration of Atropine was inappropriate. Missing from Dr. Stark's testimony, however, is any concrete statement of recognized medical standards. He offered no generally accepted standard for determining when an anesthesiologist should switch from Atropine to Ephedrine or Isuprel. An expert's personal opinion does not prove a standard of accepted medical practice. *Fernandez v. Baruch,* 52 *N.J.* 127, 131, 244 *A.*2d 109 (1968). As the Appellate Division concluded, plaintiff's failure to establish a standard of care through expert medical testimony means that plaintiff failed to prove a prima facie case against Dr. Bekhit. 243 *N.J.Super.* at 229–30, 579 *A.*2d 309.

The majority acknowledges that plaintiff failed to establish any negligence in Dr. Bekhit's continued administration of Atropine rather than Isuprel or Ephedrine. *Ante* at 175–76, 594 *A.*2d at 594. Concerning Dr. Bekhit's other conduct, the majority is unable to identify any breach of a generally accepted standard of care. That inability is understandable: Plaintiff's expert, Dr. Stark, not only failed to identify any such breach, but any standard that Dr. Bekhit might have breached. Like the majority, I accept that surgeons may rely on anesthesiologists to monitor the plaintiff's condition. The mere fact that something goes wrong, however, does not mean that the anesthesiologist was derelict. Plaintiff still must prove that the

anesthesiologist, through an act of commission or omission, did something wrong. This record sorely lacks any evidence of a generally accepted standard of care that Dr. Bekhit might have breached. I am unwilling to reject the requirement for such proof simply to hold Dr. Bekhit liable.

Finally, plaintiff failed to prove a prima facie case against the two ophthalmologists, Drs. Greenberg and Scannapiego. Again I turn to Judge Antell's analysis:

## DR. GREENBERG and DR. SCANNAPIEGO

Dr. Stark testified that Drs. Greenberg and Scannapiego "failed to pay sufficient attention to Anna Lanzet's well-being on the argument that they were concentrating on the surgery." Thus, he claimed, they failed to "respond to the audible and tactile stimuli in the operating room which signaled the decline of the patient's vital signs," that "neither appreciated the seriousness of the patient's condition ... and neither requested that the operation be aborted, prior to its conclusion." Also, "they failed to communicate with or respond to operating room personnel concerning the patient's condition and continued according to their surgical plan to conclude three cataract surgeries that morning as scheduled." In combination, Dr. Stark said, "[t]hese actions were inimical to the patient and contributed to the delay of early resuscitative efforts. Each constituted a deviation from medically acceptable standards of operating room surgeons."

Nothing in the evidence supports Dr. Stark's frequently expressed belief in the surgeons' adamant determination to complete three cataract surgeries that morning regardless of the consequences.

Nor do we find anything in the evidence to support Dr. Stark's other conclusions. All that we can discern is that the surgeons were proceeding with their work while Dr. Bekhit was administering to the patient's declining vital signs. Although Dr. Stark says they deviated from acceptable medical standards, he does not say what the standards are and does not explain at what point in the sequence of events they require these defendants to abandon the operation and apply themselves to resuscitating the patient. All we can discern is that after the patient failed to respond to the third dose of Atropine and after her cyanotic condition was noted immediate resuscitative efforts were begun. It is not enough to look back and say, in judging these physicians, that if resuscitative efforts had been earlier made the patient would have survived.

According to Dr. Stark, Dr. Bekhit's "responsibilities lie in maintaining the vital functions of the patient at as near normal as possible." We are not told of any operating room protocol whereby the surgeons may displace the anesthesiologist and determine the requirements of the patient which come under the latter's responsibilities. Nor can we determine from the testimony in what respect Drs. Greenberg and Scannapiego failed to "communicate" with the

other operating room personnel and the proximate consequences of such failure to communicate. Since Dr. Bekhit was responsible to monitor the patient's vital signs, Dr. Stark's opinion that the surgeons must answer for the failure to resuscitate sooner draws upon the "captain of the ship" doctrine, which has been expressly rejected in the State of New Jersey. *Sesselman v. Muhlenberg Hospital,* 124 *N.J.Super.* 285 [306 *A.*2d 474] (App.Div.1973). [243 *N.J.Super.* at 230–32, 579 *A.*2d 309.]

In sum, plaintiff alleges that the surgeons should have been more aware of the patient's overall needs, and that they should have initiated resuscitative efforts earlier. As with the defendant internist and anesthesiologist, plaintiff relied on Dr. Stark in her case against the ophthalmologists. Dr. Stark opined that they "deviat[ed] from medically acceptable standards of operating room surgeons," and that their actions "were inimical to the patient." Again, Dr. Stark's testimony fell short, in that it does not explain the standards in concrete terms. Plaintiff failed to establish by expert testimony accepted medical standards relating to the conduct of Drs. Greenberg and Scannapiego, and thus failed to make out a prima facie case against them. They, like the other two defendant physicians, were entitled to a favorable judgment notwithstanding the verdict.

The majority urges that "there was some failure to 'communicate'" in the operating room. *Ante* at 187, 594 *A.*2d at 1319. It does not, because on this record it cannot, state who had a duty to communicate what to whom. Again, the majority breezes past the requirement that plaintiff prove a standard of care and a breach of that standard.

In reaching its conclusion that plaintiff proved a prima facie case against Drs. Greenberg and Scannapiego, the majority relies on a snippet from Dr. Bekhit's testimony that "I did suggest stopping the operation." *Ante* at 178, 594 *A.*2d at 1314. By taking this statement out of context, the majority attempts to convey that Dr. Bekhit decided to stop the operation and that he so informed the surgeons. The doctor's full answer, however, reads: "I did suggest stopping the operation. Then, they see at which stage and whether it is safe for them to stop the operation and start resuscitation if needed or not.

Why do you stop an operation? To do something, right?" A fair reading of the entire testimony is that Dr. Bekhit believed that the surgeons were better situated to determine when the operation should stop. The majority's reading, that Dr. Bekhit told the surgeons to stop the operation, cannot withstand scrutiny. Any doubt is resolved by Dr. Bekhit's testimony on cross-examination that he believed there was no cause for alarm and that the patient was "manageable" throughout the operation, "up to almost 11:40," when the doctors called the code.

The majority asserts variously that Dr. Stark's testimony sufficed to establish liability and that other evidence also sufficed for that purpose. Nothing in the majority's opinion, however, refutes the Appellate Division's painstaking determination that the expert testimony, as to each of the defendants, either failed to establish a standard of care or failed to establish causation.

Concerning the evidence other than Dr. Stark's testimony, the majority points to a defense expert's affirmative response to the following question on cross-examination: "It would be good, sound operating procedure for everyone in there, including the surgeons and the anesthesiologist, to be aware of the patient's needs. Isn't that fair to say?" *Id.* at 178, 594 *A.*2d at 1314. The majority infers from this that "there is simply no doubt in this case that there was evidence of a standard of care required of all attending physicians in the operating room." *Ibid.* The inference is unjustified. A procedure may be both "good" and "sound" without setting a generally accepted standard of medical care. The deficiency in plaintiff's case was not that plaintiff failed to present testimony that defendants might have behaved differently, but that she failed to prove that their behavior breached generally accepted medical standards. Moreover, "to be aware of the patient's needs" amounts to no more than an unhelpful bromide. The majority's standard, that doctors should be aware of their patients' needs, is no more helpful than one asserting that surgeons should make incisions in the right place or that physicians should prescribe the correct

medication. The standard is not adequate to determine whether a doctor has committed malpractice.

I reach that conclusion without, as the majority fears, weighing the reliability and credibility of expert opinion testimony. Moreover, my reading of the record persuades me that this is not a case of mere oversight on the part of plaintiff's counsel or expert. Despite the best efforts of able trial counsel, aided by the testimony of an experienced expert witness, plaintiff was unable to prove that defendants deviated from generally accepted medical standards in any way causally connected to the tragic outcome. The picture that emerges is one of physicians trying hard in a tight situation. Even plaintiff's expert recognized that the critical period was confined to the five minutes between 11:35 and 11:40. At 11:35, Anna's heartbeat dropped below 40 and Dr. Bekhit administered the second dose of Atropine. At 11:40, the doctors called "the Code" and administered cardiopulmonary resuscitation. Dr. Stark acknowledged that the administration of Atropine at 11:35 was acceptable. Making an allowance of fifteen to thirty seconds for that dose to take effect, the critical period narrows further. During that period, it was Dr. Bekhit's medical judgment that the patient's condition was manageable. Plaintiff's expert never testified otherwise. In the few moments allotted to them, the doctors were reacting to an emergency. Perhaps a different course of conduct might have led to a happier outcome. An unsuccessful outcome, however, does not bespeak malpractice. As Dr. Stark acknowledged on cross-examination, "[p]eople have been known to die when they have been rendered standard medical treatment." When operating, a doctor's legal obligation is to conform to acceptable standards of medical care. Plaintiff has not proved a breach of those standards.

As a basis for a new trial, the majority embraces the "increased risk" theory of *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1990), and *Olah v. Slobodian*, 119 *N.J.* 119, 574 *A.*2d 411 (1990). These cases, however, hold unmistakably that application of the increased risk theory to damages is to be prospective

only. As we said in *Scafidi, supra,* 119 *N.J.* at 114, 574 *A.*2d 398, "[i]n view of the significant change in the law represented by our holding concerning the measure of damages, the effect and application of that holding, except with respect to this case and [*Olah*], also decided today, shall be prospective only." Whatever else that statement might mean, it surely means at least that the increased risk damage analysis does not apply to cases in which both the events and the trial occurred several years before the *Scafidi* and *Olah* decisions.

The majority acknowledges that those decisions require a prospective-only application of the increased risk damage analysis. *Ante* at 188–189, 594 *A.*2d at 1320. Without offering any reason for ignoring that requirement, it casually asserts that an increased risk charge would have assisted the jury, and that the absence of such a charge constitutes reversible error. This, despite plaintiff's failure to request the charge or to object to the charge as given. I submit that the failure to give an increased risk charge is precisely what the Court anticipated in making the increased risk rule prospective. The majority's only explanation for ignoring that requirement is "[t]his case illustrates the complexities of presenting medical causation issues to a jury when there is a preexisting condition." *Id.* at 188, 594 *A.*2d at 1320. The majority does not suggest, however, that medical causation issues are any more difficult this year than last year. Just as it ignores the net opinion rule, the majority ignores the prospectivity requirement of *Scafidi.* The simple explanation for both oversights is that the majority cannot sustain its holding if it recognizes either requirement.

To conclude, plaintiff presented considerable evidence about the operation, but she did not prove a prima facie case against any of the defendants. Her expert's conclusory opinion, unsupported by any factual explanation, cannot support the verdict. Accordingly, I would affirm the judgment of the Appellate Division.

208

*For affirmance* —Justices CLIFFORD, POLLOCK and GARIBALDI—3.

*For reversal and remandment* —Chief Justice WILENTZ, and Justices HANDLER, O'HERN and STEIN—4.