91 N.J. Super. 135 (1966)
219 A.2d 426
KATHERINE ROGOTZKI, AS GUARDIAN AD LITEM, ETC., ET AL., PLAINTIFFS-APPELLANTS,
v.
DR. SAMUEL S. SCHEPT AND DR. WILLIAM JAY SNYDER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1965.
Decided April 28, 1966.
*143 Before Judges GOLDMANN, FOLEY and COLLESTER.
Mr. Nicholas H. Politan argued the cause for appellants (Messrs. Krieger, Chodash & Politan, attorneys).
Mr. Robert E. Tarleton argued the cause for respondent Dr. Samuel S. Schept (Messrs. Beggans and Keale, attorneys; Mr. James P. Beggans, of counsel).
Mr. William P. Braun argued the cause for respondent Dr. William Jay Snyder (Mr. J. Emmet Cassidy, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs appeal by leave of court from a Law Division interlocutory order denying their motion to compel defendants to answer certain questions, over 70 in number, put to them in the course of depositions. This is a medical malpractice action wherein the infant plaintiff, *144 suing by her guardian ad litem, seeks damages for permanent injuries caused by defendants' negligent diagnosis and treatment. Her parents sue per quod.
Infant plaintiff, then six years old, was admitted to the North Hudson Hospital by defendant Dr. Schept, who performed an appendectomy on May 25, 1953, assisted by defendant Dr. Snyder. She was discharged as "cured" on May 30. She was, in fact, not cured and had to be readmitted to the hospital. The second operation, performed June 9, 1953, this time by Dr. Snyder assisted by Dr. Schept, revealed a postoperative peritonitis, the result of a fecal fistula. It would appear that the girl was subsequently transferred to another hospital where she had to undergo further treatment and operations.
As set forth in the complaint and pretrial order, defendants' alleged negligence consisted of their failure properly to diagnose and treat the infant for appendicitis; negligently performing an appendectomy; unnecessarily cutting into areas that were not connected with the appendectomy; failure to practice aseptic techniques; failure properly to diagnose and treat the child subsequent to the appendectomy; negligently treating and abandoning her by allowing her discharge from the hospital as cured, when in fact she was not; failure properly to treat, diagnose and operate upon her subsequent to her readmission to the hospital, and negligently diagnosing, treating and operating upon plaintiff.
Defendants were deposed at some length on three different dates. In the course of these examinations questions were propounded by plaintiffs which related to defendants' findings, diagnoses and opinions while they were engaged in treating infant plaintiff. Defense counsel directed their respective clients not to answer a number of these questions, principally on the basis that they called for expert professional opinion. Plaintiffs moved to compel defendants to answer the questions as propounded. Their motion was denied, and we thereafter granted leave to appeal from the interlocutory order of the Law Division.
*145 The reasons for some of defendants' objections were that the questions put were repetitious, oppressive, unintelligible, or without foundation. Such questions do not fall strictly within the legal issue posed on this appeal, set out in plaintiffs' "Statement of Questions Involved":
"In a malpractice action, may a defendant doctor be examined at depositions with relation to his findings, diagnosis [diagnoses] and opinions concerning his treatment of the plaintiff?"
As noted hereinafter, the objections just mentioned were in some instances properly taken. However, most of the 70-odd objections fall squarely within the stated issue.
We do not deal with the familiar situation of a party seeking discovery of an expert witness engaged by the adverse party and who is later to testify for that party. Here, the experts are defendants themselves. Nonetheless defendants assert, and the trial judge agreed, that a treating physician who is a party defendant may not be compelled to answer on depositions such questions as call for his expert opinions or conclusions related to the treatment he rendered.
Defendant Snyder argues that the ruling below is supported by that part of R.R. 4:16-2 which provides:
"* * * A party may require any other party to disclose the names and addresses of proposed expert witnesses; except as provided in R.R. 4:25-2 [report of findings], such disclosure shall be solely for the purpose of enabling the party to investigate the qualifications of such witnesses in advance of trial. * * *"
Pointing to the word "solely," he claims that no other information may be obtained from such an expert, even though he be a party to the action. His reliance upon this single sentence in R.R. 4:16-2 and its use of the word "solely" is misplaced.
R.R. 4:16-1 states that
"After the commencement of the action, any party may take the testimony of any person, including a party, by deposition upon oral examination * * * for the purpose of discovery * * *." *146 And R.R. 4:16-2 directs that
"Unless otherwise ordered by the court as provided by Rule 4:20-2 [orders for the protection of parties and deponents] or 4:20-4 [motion to terminate or limit examination], the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the examining party or to the claim or defense of any other party * * *. It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence. * * *"
The sentence upon which Dr. Snyder relies appears much later in R.R. 4:16-2 and is addressed to a limited subject matter  the requirement that any other party disclose the names and addresses of his proposed expert witnesses so that their qualifications may be investigated prior to trial.
By very definition, the gravamen of the charge of malpractice involves the diagnoses, treatments and opinions rendered by both defendants in their treatment of infant plaintiff. They were engaged by her parents (plaintiffs in this action) and were paid by them, and it is as a result of their services, treatments and medical opinions, formulated at the time they were discharging their duty as treating physicians, that this action is pending.
R.R. 4:16-2 is an adaptation of Federal Rule of Civil Procedure 26 (b). It was specifically designed to encourage and foster full pretrial discovery of all matters not privileged and not specifically excepted from the operation of the rule (such as the work product of an attorney), which are relevant or which may lead to relevant evidence concerning the respective positions of a plaintiff or defendant. Our discovery rules are designed "to afford parties litigant avenues of inquiry before trial in order that substantial justice might be achieved." Callahan v. National Lead Co., 4 N.J. 150, 156 (1950).
Liberal procedures for discovery, as the late Chief Justice Vanderbilt said, are essential to any modern judicial system in which the search for truth in aid of justice is paramount. *147 Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338 (1951). More than a decade ago this court, in Interchemical Corp. v. Uncas Printing & Finishing Co., Inc., 39 N.J. Super. 318 (1956), clearly indicated that the broadest possible latitude should be accorded pretrial discovery. The discovery rules, we said, "displaced what has been called the `sporting' concept of a law action which all too often characterized the former practice. They inaugurated a permanent open season on facts." (at page 325).
Defendants apparently concede that discovery may be had as to the treatment they rendered, their office records, and all objective facts within their knowledge. This is evident from a reading of the depositions and their argument on this appeal. However, they continue to object to any inquiry on depositions with regard to their opinions and conclusions because the answers called for by the questions put would require their "expert opinions." Dr. Schept, who presents the main argument in defense of this position, relies on Hull v. Plume, 131 N.J.L. 511 (E. & A. 1944), where, in a medical malpractice suit, the court held that plaintiff could properly call upon defendant doctors to testify despite the fact that they were adverse parties, by virtue of the statute R.S. 2:97-12 (now N.J.S. 2A:81-11), which permitted examination of an adverse party as a witness. However, they could not be called and compelled to give expert testimony against their will. We do not consider the Hull case as authority binding upon us in the present circumstances. In the first place, it involved testimony sought to be elicited of a defendant doctor at the trial itself. Secondly, the questions there objected to endeavored to elicit from the witness "information as to various forms or hypothetical methods of treatment, and to obtain directly or indirectly his own opinion as to such matters, * * *." (at page 516; italics ours)
As we have already pointedly observed, this case involves questions put at pretrial discovery and not at the trial itself. Were we called upon to pass on the question considered in Hull, and were the Hull opinion that of a court other than *148 our former Court of Errors and Appeals, we would deem its result somewhat less than an enlightened one. In our view, it runs counter to the trend of liberal decisions where the aim is to reach at the truth of the matter, rather than indulge in the niceties which have so often characterized evidence law in the past.
A ready example of the more enlightened and practical view is McDermott v. Manhattan Eye, Ear & Throat Hospital, 15 N.Y.2d 20, 255 N.Y.S.2d 65, 203 N.E.2d 469 (Ct. App. 1964). The single question posed in that appeal, and one of first impression in New York, concerned the right of a plaintiff in a malpractice suit to call to the witness stand the doctor he was suing and question him as a medical expert. Judge Fuld, writing for a unanimous court, had this to say  and we quote him at length because we so fully agree with him:
"* * * That the defendant is an `expert' and that the particular questions asked of him are those which only an expert can answer, seem beside the point. It is at least arguable that the doctor's knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters of `fact' as are the diagnosis and examination he made or the treatment upon which he settled. More importantly, however, by allowing the plaintiff to examine the defendant doctor with regard to the standard of skill and care ordinarily exercised by physicians in the community under like circumstances and with regard to whether his conduct conformed thereto, even though such questions call for the expression of an expert opinion, the courts do no more than conform to the obvious purpose underlying the adverse-party-witness rule. That purpose, of course, `is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action.' (State, Use of Miles v. Brainin, 224 Md. 156, 161, supra; see, also, Lawless v. Calaway, 24 Cal.2d 81, 90 [147 P.2d 604], supra.) The issue whether the defendant doctor deviated from the proper and approved practice customarily adopted by physicians practicing in the community is assuredly `pertinent and relevant' to a malpractice action. Indeed, absent such proof, the plaintiff's case would have to be dismissed. Moreover, evidence on this issue is, in most instances, `available' from the defendant doctor.
The importance of enabling the plaintiff to take the testimony of the defendant doctor as to both `fact' and `opinion' is accentuated by recognition of the difficulty inherent in securing `independent' expert witnesses. It is not always a simple matter to have one expert, a doctor in *149 this case, condemn in open court the practice of another, particularly if the latter is a leader in his field. In consequence, the plaintiff's only recourse in many cases may be to question the defendant doctor as an expert in the hope that he will thereby be able to establish his malpractice claim.
There is nothing unfair about such a practice. Unlike his counterpart in a criminal prosecution, the defendant in a civil suit has no inherent right to remain silent or, once on the stand, to answer only those inquiries which will have no adverse effect on his case. Rather, he must, if called as a witness, respond to virtually all questions aimed at eliciting information he may possess relevant to the issues, even though his testimony on such matters might further the plaintiff's case. We cannot agree with the suggestion that it is somehow neither sporting nor consistent with the adversary system to allow a party to prove his case through his opponent's own testimony (see, e.g., Osborn v. Carey, 24 Idaho 158, 168 [132 P. 967], supra; see, also, Comment, 5 So. Cal. L. Rev. 448, 449-450) but, whatever the merits of this view, we prefer to believe that, in a situation such as the present, `[t]he ultimate requirement that judicial decisions be based on the * * * facts overcomes any detriment which might be suffered by the adversary system.' (Friedenthal, Discovery and Use of an Adverse Party's Expert Information, 14 Stan. L. Rev. 455, 487; see, also, King, The Adverse Witness Statute and Expert Opinion, 4 Wayne L. Rev. 228, 229.)"
And see Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604 (Sup. Ct. 1944), and State, for Use of Miles v. Brainin, 224 Md. 156, 167 A.2d 117, 88 A.L.R.2d 1178 (Ct. App. 1961), cited in the quoted text; Oleksiw v. Weidener, 2 Ohio St.2d 147, 207 N.E.2d 375 (Sup. Ct. 1965).
Returning, now, to a consideration of this case within the broader pretrial discovery frame of reference, R.R. 4:16-2 does not in any event require depositions to disclose admissible evidence. Assuming, for the moment, that under N.J.S. 2A:81-11 plaintiffs' scope of examination of either defendant while on the stand would still be controlled by Hull v. Plume, rather than the reasoning behind the McDermott decision, this does not mean that plaintiffs cannot depose defendants prior to trial in the manner attempted by most of the questions which were put to them. As the author of the annotation to State, for Use of Miles v. Brainin, above, said in 88 A.L.R.2d 1186, 1190 (1963):
*150 "Where a statute or rule permits a party to examine his adversary before trial for the purpose of discovery, the courts generally tend to be more lenient in construing such statute or rule as giving the right to elicit expert testimony than if the examination were being conducted at trial."
In effect, this was what the court allowed in Di Donna v. Zigarelli, 61 N.J. Super. 302 (App. Div. 1960), where defendant was successful in his application to take the deposition of plaintiff's prospective medical witness, who was also a treating physician. The court said:
"There can be no doubt that in this case defendant is entitled to inquire of the physician, who treated the minor plaintiff subsequent to the time that he was under defendant's care, as to the dates and places of his treatment, his observations, results of tests conducted and relevant statements or admissions made by the adult plaintiffs, as well as the `history' which he may have received from the parents of the infant. Also, specifically limiting our ruling to the situation existing in the case at bar, we hold that the defendant herein is entitled by deposition to inquire into the findings and diagnoses made and the opinion of the treating physician and to require the production of records incident to his activity as a treating physician." (at pages 311-312; italics ours)
Defendants here attempt to limit Di Donna to its facts, but it is difficult to conceive how this helps them. They are the treating physicians, and to prove medical malpractice plaintiffs must know exactly what they did and what conclusions they reached in the course of their treatment in order to show later at the trial that they failed to follow accepted medical practice. Defendants are the only individuals with knowledge, and the Di Donna holding implicitly recognizes that they should not be able to hide that knowledge.
In 4 Moore, Federal Practice, § 33.17 (1963), the author, after acknowledging the existence of cases holding that interrogatories (substitute "depositions") which call for opinions and conclusions are improper (at page 2303), goes on to say:
"The correct approach to the problem, it is submitted, requires the discarding of any dogmatic ideas that matters of opinion may never be called for by interrogatory. There is nothing in the language of the *151 rules to require such a holding. The rules do not say that only `facts' may be the object of discovery proceedings; * * *. In passing upon objections to interrogatories the question before the court should not be whether, as a theoretical matter, the interrogatory calls for an expression of opinion, but whether an answer would serve any substantial purpose. * * * If the answer might serve some legitimate purpose, either in leading to evidence or in narrowing the issues, and to require it would not unduly burden or prejudice the interrogated party, the court should require answer." (at pages 2310-2311)
and
"* * * Liberal use of interrogatories for the purpose of clarifying and narrowing the issues made by the pleadings should be permitted and encouraged by the courts. Only in this manner can the proper interrelation between the pleading and the discovery rules be maintained." (at page 2312)
Courts which have considered the deposition problem before us have carefully distinguished the paid expert from a defendant who is also an expert, e.g., Russo v. Merck & Co., 21 F.R.D. 237 (D.R.I. 1957). The court there first quoted with approval from Moran v. Pittsburgh-Des Moines Steel Co., 6 F.R.D. 594, 596 (W.D. Pa. 1947) (defendants' employee questioned as to chemical properties of steel in a tank which exploded):
"* * * Although the answer to these questions will carry the opinion of the witness, it will amount to a statement of facts as to why certain things were done, or not done, by the defendants. Unless this information is made available, and this is the one person who knows, a full and complete picture will not be presented when consideration is given as to whether negligence or lack of care existed in the construction of said tank."
Plaintiff in Russo sought to depose defendant's managing agents to ascertain facts surrounding the methods it employed in producing blood plasma. Defendant requested the court to limit the depositions "to exclude any questions calling for answers based on the expert knowledge of the witnesses deposed or their opinions," and to exclude all hypothetical questions. Holding that the Moran rule was sound and should be followed, the court in Russo said:
*152 "* * * The methods employed by the defendant in the production of its blood plasma are solely within its knowledge. The plaintiff is entitled to liberal discovery in attempting to ascertain the facts surrounding its production. She is entitled to know why certain things were done, or were not done, by the defendant. The fact that the deponents possess expert knowledge should not immunize them from examination or inquiry designed to give a complete picture as to whether negligence existed in the production of the blood plasma and as to whether the defendant had `knowledge and notice' that the blood plasma sold and distributed by the defendant and injected into the deceased contained said `poisonous and deleterious substances.' Questions which will elicit answers bearing on these issues are proper even though such answers may constitute the opinions of the deponents.
Under the Federal Rules of Civil Procedure liberal pretrial discovery procedures are intended. This being so, the power of this Court under Rule 30(b) to limit the scope of an examination under Rule 26 should not be exercised in the absence of a showing that the examination is being conducted in bad faith and in such a manner as unreasonably to annoy, embarrass or oppress the deponent or the opposite party. Schwartz v. Broadcast Music, D.C.S.D.N.Y. 1954, 16 F.R.D. 31; Banana Distributors, Inc. v. United Fruit Company, D.C.S.D.N.Y. 1956, 19 F.R.D. 244. No such showing has been made here." (21 F.R.D. 239-240; italics ours)
The problem in analysis encountered when considering cases like Russo is that the reports do not indicate the actual questions asked. (It is for that reason that we have hereinafter detailed most of the questions to which defendants objected.) It is clear that defendants may be deposed as to the facts of the treatment they gave  what they did, what they saw, and the diagnoses rendered. It is also clear that they may not be asked to respond to purely hypothetical questions. But we think it plain that it is not "opinion" to have them explain why something was done or not done. Thus, in Connecticut Mutual Life Ins. Co. v. Shields, 17 F.R.D. 277 (S.D.N.Y. 1955), the court, after recognizing the distinction between an expert witness hired by one of the litigants and a defendant expert, stated:
"* * * But Waterbury [defendant and a member of defendant engineering firm] cannot immunize himself with this rule by arguing that he is an expert in the field in which he is being examined, when the pre-litigation calculations made by him form an essential part of plaintiffs' case against the defendants. In short, while Waterbury's *153 answers might include the expert opinion of a witness, in the context of this case it will amount to no more than a statement of facts by a factual witness to the events which form the subject matter of the action. See Moran v. Pittsburgh-Des Moines Steel Co., D.C.W.D. Pa. 1947, 6 F.R.D. 594." (at page 279; italics ours)
See also Wilson v. Superior Court, 148 Cal. App.2d 433, 307 P.2d 37 (D. Ct. App. 1957); Macrina v. Smith, 18 F.R.D. 254 (E.D. Pa. 1955); Bugen v. Friedman, 10 F.R.D. 231 (E.D. Pa. 1950); Annotations, 86 A.L.R.2d 138, 193 (1962) and 88 A.L.R.2d 1186, 1190 (1963). In Coxe v. Putney, 26 F.R.D. 562 (E.D. Pa. 1961), it was held proper to inquire on depositions whether defendant doctor would have been helped if he knew of plaintiff's prior reactions to similar examinations; whether knowledge of prior examinations would have affected his procedure; and, assuming knowledge, would he have acted differently? The hypothetical questions were held proper because plaintiff alleged he would prove their underlying facts. The Coxe court took particular note of the basic philosophy of full pretrial discovery, namely, to narrow the issue for trial.
Where the expert testimony of a defendant doctor is brought into issue as a result of his exercise of expert judgment, pretrial discovery relating to his opinion and exercise of judgment in the course of treating his patient is no different from any case in which an adverse party has knowledge of relevant matters. To hold otherwise would, particularly in a medical malpractice case, put a plaintiff to a disadvantage. The critical information necessary to a proper understanding and presentation of the case is almost exclusively within the knowledge of the defendant-expert. Further, courts have generally recognized how difficult it is for a plaintiff to obtain competent expert testimony in a medical malpractice case. See, for example, Carbone v. Warburton, 22 N.J. Super. 5, 13 (App. Div. 1952), affirmed 11 N.J. 418 (1953); and see, generally, 7 Am. Jur., Proof of Facts, 484 (1960)
*154 Whatever the limits of discovery, there certainly should be included a full explanation of why defendants performed certain acts or did not perform them. Their findings and actual course of treatments, their diagnoses and their opinions as to the proper course of treatment, are legitimate subjects of inquiry. The opinions, of course, must relate to the treatment rendered infant plaintiff.
We now turn to the specific questions which defendants refused to answer upon objection by their respective attorneys at the discovery proceedings. We have considered the questions and appendix page references listed by plaintiffs in their appellate brief and have numbered them for ready reference as to each defendant. In view of what we have said, the following questions asked of Dr. Snyder should have been answered (omitted questions will be considered immediately after the following):
2. "Q. There were no other physicians in attendance, were there? A. At the table, no.
Q. They would have been the only ones that could properly remove a specimen. Isn't that correct?" (P48a-4 to 7)
3. "Q. Did you ascertain any other area that could have been, based on your observations, the primary source of the infection and inflammation?" (P50a-23 to 25)
5. "Q. Where was that pussy discharge originating from, based on your observations before the operation?" (P55a-1 to 2)
6. "Q. Did you observe any pus coming out of the pelvis prior to the operation?" (P55a-13 to 14)
7. "Q. What did you conclude from your observation of this pussy discharge?" (P56a-10 to 11)
8. "Q. Well, what additional facts were taken into account in reaching that conclusion [the existence of a fistula of the small bowels]?" (P56a-15 to 19)
9. "Q. Upon what facts did you conclude post-operatively that there was an intestinal obstruction?" (P57a-19 to 20)
10. Same question as No. 9  only after establishing that such a diagnosis had been made. (P58a-3 to 5)
11. "You are aware, however, that Dr. Schept prescribed physics after the appendectomy * * *?" (P59a-3 to 4)
12 & 13. "Q. Was there any difference in the inflammation of the appendix on May 25, 1953, which you have just testified to and the four inches of the terminal ileum in the cecum which you testified as having been observed on June 9, 1953?" (P59a-23 to 25, and P60a-9 to 13)

*155 14 & 15. "Q. What was the purpose of these X-rays [taken before the second operation]?" (P62a-13 and 17 to 18)
16 & 17. "Q. Dr. Snyder, did you make a determination as to the cause of this infection due to bacteria?
* * * * * * *
Q. What was that opinion?" (P63a-16 to 17 and 21)
18. "Q. What were your surgical objectives in removing four inches of the ileum?" (P64a-23 to 24)
22. "Q. On June 9, 1953, did you observe any necrosis of the ileum?" (P69a-18 to 19)
23, 24 & "Q. [Regarding the second operation of 25. June 9, 1953] Did you make a determination as to the cause of this infection due to bacteria?" (P70a-21 to 71a-9)
26 & 27. "Q. Based on your observations, did you come to a conclusion as to the cause of the peritonitis?" (P74a-22 to P75a-3)
28. "Q. Did you observe any dilation of the ileum during the operation of June 9, 1953?" (P75a-13 to 14)
29. "Q. Did you observe any anatomical variation during the appendectomy operation * * * on June 9, 1953?" (P75a-18 to 20)
30. "Q. Did you observe any anatomical distortions during the appendectomy operation * * * on May 25, 1953?" (P75a-23 to 24)
31. "Q. Do you recall during the appendectomy operation * * * on May 25, 1953, if there was any surgical incident that might possibly or probably, rather, be medically related to the peritonitis and the intestinal obstruction that you subsequently diagnosed?" (P75a-2 to 6)
32 & 33. "Q. During the appendectomy operation of May 25, 1953, did you observe any inadvertent cutting [or tearing  No. 33] of tissue?" (P76a-10 to 16)
34. "Q. During the appendectomy operation of May 25, 1953, did you observe any hemorrhaging from poorly tied blood vessels?" (P76a-19 to 21)
35. "Q. During the treatment * * * in the North Hudson Hospital, to your knowledge, was there any diagnostic error by you or by any other person?" (P76a-25 to P77a-2)
36. "Q. Did you agree with the diagnosis arrived at by Dr. Schept after the appendectomy?" (P77a-6 to 7)
37. "Q. Prior to arriving at your diagnosis of peritonitis and intestinal obstruction did you consult with any other physician?" (P78a-18 to 20)
Of the questions listed by plaintiffs, Nos. 4, 19 and 21 (omitted) addressed to Dr. Snyder were answered even though his counsel instructed him not to. They therefore do not belong on the list. Nos. 1 and 20 (also omitted) have no *156 relation to findings, treatment, diagnoses or opinions and are not properly part of this appeal. R.R. 1:7-1 (c), 2:7-1; Diaz v. Newark Industrial Spraying, Inc., 65 N.J. Super. 249, 252 (App. Div. 1961), affirmed 35 N.J. 588 (1961). Nor do the questions appear material.
The remaining questions set out above should all, as noted, have been answered. Some, it will be observed, were capable of being answered with a simple "yes" or "no," since they call for no more than the affirmation or denial of a fact known only to the deposed defendant. Others asked only what the doctor saw or did (e.g., Nos. 3, 5, 6, 12 and 13, 16 and 17, 22, 36 and 37)  they are entirely factual.
Only questions 2, 7, 8, 14 and 15, 18, 34 and 35 are even debatable, but it should be remembered that discovery is to be liberally applied. It is only proper that defendants be required to come forward with a full explanation of their actions. No. 2 asks for a conclusion, but it is a conclusion that on its face appears to be one that any qualified doctor can answer. It relates to his knowledge of what was actually happening or not happening. See, e.g., Russo v. Merck & Co., above. No. 7 asks for no more than the doctor's diagnosis based on what he saw. Di Donna v. Zigarelli, above, clearly requires an answer. No. 8 asks how a diagnosis was arrived at. However, it does not ask for any mental process; rather, it asks for the facts used in arriving at the diagnosis. It thus calls for no more than a recital of observed facts, and is proper. Nos. 14 and 15 ask why something was done, and were proper under Russo and the other cited cases. No. 18 is similar. Essentially, these three questions seek out the facts. No. 34 would appear to call for a conclusion, but it is one which a qualified surgeon could make by mere observation. Of course, it takes an expert to know if blood vessels are "poorly tied," but the expert (here a defendant) cannot hide behind his expert knowledge when he actually observes something. No. 35 is similar.
As for Dr. Schept, the following questions should have been answered:

*157 1. "Q. Well, * * * aren't some of these findings which you have testified to also diagnostically significant of other diseases other than appendicitis?" (P92a-8 to 11)
2. "Q. Was your diagnosis * * * at the time of her discharge from the North Hudson Hospital that she was cured?" (P103a-1 to 3)
4. "Q. Did you attach any significance diagnostically to the presence of temperature on May 29, 1953 * * *?" (P118a-10 to 12)
5. "Q. Did you attach any significance diagnostically to the inability to move the bowels on May 30, 1953, the very day you discharged Diane Rogotzki?" (P118a-16 to 18)
6. "Q. [Prior to that discharge] did you in any manner attempt to ascertain whether or not, an infection had set in in the site of the appendectomy?" (P119a-22 to 25)
7. "Q. [At the time of said discharge] you were aware that she was unable to move her bowels without the assistance of milk of magnesia, a glycerine suppository insert, or a soap suds enema?" (P119a-9 to 13)
9. "Q. Would any of those three findings alone have justified your conclusion of the existence of an infection or all three, if necessary?" (P144a-18 to 20)
10. "Q. Did you attach any diagnostic significance to that entry made by the nurse on May 29, 1953?" (P152a-2 to 6)
13. "Q. * * * Would you explain what you mean by negative [urine test]?" (P175a-16 to 18)
14. "Q. By negative do you mean that there was no indication of an infection in the urinalysis?" (P175a-23 to 24)
15. "Q. And what did that mean to you, the rise in white blood count [a result of blood test]?" (P176a-19 to 20)
16. "Q. Did that indicate to you the possibility of an infection being present?" (P176a-24 to 25)
17. "Q. Is there any other indication on the blood test other than possibility of an infection?" (P177a-10 to 11)
19. "Q. Would you explain that in a little bit more detail [why penicillin was prescribed on May 30, 1953]?" (P119a-19 to 20)
20. "Q. Now, what was the purpose of your prescribing the injection of a combiotic on May 30, 1953?" (P198a-16 to 17)
21. "Q. * * * For what reason did you direct the injection of a simbiotic * * * on May 30, 1953?" (P199a-24 to 25)
31. "Q. An indicated finding, Dr. Schept, of acute ileus is not the same as a diagnosis of peritonitis and intestinal obstruction, is it?" (P212a-2 to 4)
32 & 33. "Q. What is an acute ileus * * *?" (P212a-8 and 22 to 24)
35. "Q. What were some of those other diseases that had overlapping symptoms [with acute appendicitis]?" (P233a-14 to 20)

*158 36. "Q. The treatment in May of 1953 for these other diseases, other conditions which have similar symptoms, albeit not identical symptoms to acute appendicitis, was different than the treatment for acute appendicitis * * *?" (P233a-24 to 234a-3)
Nos. 3, 8, 18, 22 to 30, and 34 (omitted) were not answered because they were repetitious  otherwise they were proper. However, plaintiffs do not argue that refusal to answer on this ground was improper. Defendants consider the questions abandoned. We agree. Diaz v. Newark Industrial Spraying, Inc., above. A similar analysis would apply to Nos. 11 and 12 (omitted).
The remaining questions, addressed to Dr. Schept and listed above, were proper in this type of case. With the exception of questions 1, 9, 13 to 15, 31 to 33, and 35, the questions relate to what was done and why it was done, and are proper under Russo, above. Nos. 13 to 15, 32 and 33 ask for an explanation of terms used by Dr. Schept. Surely it was proper to ask him to explain so that a lay mind could readily understand. Nos. 1, 9, 31 and 35 are questions which normally would be asked on cross-examination. However, McDermott v. Manhattan Eye, Ear & Throat Hospital, above, considered in light of the much broader reach of pretrial discovery, would clearly allow them, and the difficulty of proving malpractice would seem to require that they be answered.
Reversed with direction that an order be entered requiring answers to the several questions in light of this opinion.