715 A.2d 348

MATTHEW HUTCHINSON, AN INFANT BY AND THROUGH HIS
NATURAL PARENTS AND GUARDIANS AD LITEM, MARK
HUTCHINSON AND TERRE HUTCHINSON, AND MARK
HUTCHINSON AND TERRE HUTCHINSON, INDIVIDUALLY,
PLAINTIFFS–RESPONDENTS, v. ATLANTIC CITY MEDICAL
CENTER–MAINLAND, JOSEPH L. DESTEFANO, M.D., ALAN J.
FELDMAN, M.D., LARRY J. KAUFMAN, M.D., DRS. DESTEFA-
NO, FELDMAN AND KAUFMAN, P.A., AND STUART GOLD-
MAN, M.D., DEFENDANTS, AND ALBERT C. DEARDEN, M.D.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 6, 1998—Decided August 12, 1998.

470

Before Judges SKILLMAN, EICHEN and STEINBERG.

*Melvin Greenberg* argued the cause for appellant (*Greenberg, Dauber & Epstein,* attorneys; *Mr. Greenberg* and *Mark D. Jaffe,* on the brief).

*J. Scott Kramer,* admitted pro hac vice, argued the cause for respondents Matthew Hutchinson, Mark Hutchinson, and Terre Hutchinson (*Duane, Morris & Heckscher,* attorneys; *Mr. Kramer* and *James L. Beusoleil, Jr.,* of counsel and on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D.

The primary issue presented by this appeal is whether the Court of Errors and Appeals' decision in *Hull v. Plume,* 131 *N.J.L.* 511, 37 *A.*2d 53 (E. & A.1944), holding that a plaintiff in a medical malpractice action cannot compel a defendant doctor to express an expert opinion, is still controlling law in this State.

Plaintiff Matthew Hutchinson was born at the Atlantic City Medical Center on August 16, 1991. It was a difficult delivery,

and the family's obstetrician, defendant Alan J. Feldman, used forceps to facilitate the birthing process. As a result, Matthew suffered a large cephalhematoma (swollen bruise) on his head. In addition, it was discovered several weeks later that the forceps delivery had caused a linear fracture of the baby's skull under the cephalhematoma.

Defendant Dr. Stuart Goldman, a pediatrician, examined Matthew the morning after delivery and did not detect any abnormality. Nevertheless, because standing orders of the pediatrics department at the hospital required a complete blood count (CBC) for all newborns, Dr. Goldman requested that these tests be performed.

The following afternoon, defendant Dr. Albert C. Dearden, another pediatrician who was covering for Dr. Goldman, examined Matthew and also did not detect any abnormality. Although Dr. Dearden's normal practice was to look at the blood test results when doing an examination, the baby's chart admittedly did not include the results of a CBC. Nevertheless, Dr. Dearden discharged the baby from the hospital following his examination.

After Matthew's parents, plaintiffs Mark and Terre Hutchinson, arrived home, they became concerned about the appearance of the cephalhematoma. Consequently, they scheduled an appointment with another pediatrician, Dr. Budnick, whose associate, defendant Dr. Mona El Genaidi, examined Matthew on August 21, 1991, and also did not detect any abnormality.

However, on August 29, 1991, Matthew suddenly became very red and tense, spit up blood and mucus, and had problems breathing. He was then rushed to the emergency room of the hospital, where he was subsequently diagnosed with E. coli meningitis and osteomyelitis. As a result of these conditions, Matthew was left with various permanent disabilities, including total deafness in both ears.

Plaintiffs subsequently brought this malpractice action against Drs. Feldman, Goldman, Dearden and El Genaidi as well as

various other defendants who were eventually dismissed. The case was tried before a jury in a fifteen day trial. During jury deliberations, plaintiffs entered into a high/low settlement agreement with Dr. Feldman. The jury found that Dr. Goldman had not committed malpractice and returned a verdict of no cause of action in his favor. The jury found that Dr. Feldman had committed malpractice, but that his malpractice was not a proximate cause of the baby's injuries. Consequently, the jury returned a verdict in his favor. However, in accordance with the settlement agreement, plaintiffs recovered $500,000 from Dr. Feldman's insurance carrier. The jury found that Drs. Dearden and El Genaidi had committed malpractice which was a proximate cause of the baby's injuries. The jury apportioned 25% liability to Dr. Dearden and 75% to Dr. El Genaidi. The jury awarded plaintiffs $229,502 for past medical expenses,[1] $730,000 for future medical expenses, and $2,500,000 for all other damages. The court subsequently denied defendants' motions for a new trial, judgment notwithstanding the verdict, or a remittitur, and after adding $437,703 in prejudgment interest to the jury's damages award, entered judgment for plaintiffs.

Defendants filed separate notices of appeal, which were consolidated, and submitted a joint brief in support of their appeals. However, Dr. El Genaidi filed a petition for bankruptcy shortly before the scheduled date for oral argument. Consequently, we entered an order severing the appeals.

■ On appeal, Dr. Dearden argues that the trial court committed reversible error in allowing plaintiffs to use his own deposition testimony to establish the standard of care, that plaintiffs failed to present the expert testimony required to establish their claim against him, and that the court's jury instructions regarding

---

[1] The court determined that all but $12,733 of the past medical expenses had been reimbursed by medical insurance and pursuant to *N.J.S.A.* 2A:15–97 entered judgment for this reduced amount.

proximate cause were incorrect. We reject these arguments and affirm the verdict in plaintiff's favor against Dr. Dearden.[2]

Before addressing Dr. Dearden's arguments, it is appropriate to set forth the grounds of plaintiffs' claim. Plaintiffs' theory of the case was that Dr. Feldman negligently performed the delivery of the child, which allowed E. coli bacteria from the mother to enter the cephalhematoma where it eventually moved through the skull fracture into the skull bone, and then into the meninges, ultimately leading to meningitis. Plaintiffs' expert, Dr. Robert Sweeney, testified that the infection was present from birth, and that Dr. Dearden committed malpractice by failing to follow-up on results of the CBC ordered by the hospital, which would have revealed the infection and provided the opportunity for effective treatment before the meningitis developed.

On the other hand, the experts for Dr. Dearden and the other defendants expressed the opinion that the E-coli bacteria started from within the body and eventually moved to the cephalhematoma through the blood stream and that a detectible infection could only have existed for a few days prior to the baby's emergency admission into the hospital. Consequently, the blood test results which were missing from the baby's chart at the time of Dr. Dearden's examination would not have revealed any infection. Dr.

---

[2] The judgment imposes liability upon Dr. Dearden for "25% of the total judgment calculated in accordance with the terms of this judgment." The judgment further provides that "[n]othing in this judgment shall be interpreted as limiting plaintiffs' right of recovery under *N.J.S.A.* 2A:15–5.3." *N.J.S.A.* 2A:15–5.3b provided at the time of Dr. Dearden's malpractice that a plaintiff could recover "[t]he full amount of economic damages plus the percentage of noneconomic damages directly attributable to that party's negligence from any party determined by the trier of fact to be more than 20% but less than 60% responsible for the total damages." *N.J.S.A.* 2A:15–5.3b (deleted by amendment, *L.* 1995, *c.* 140, § 2, effective June 29, 1995). Consequently, even though Dr. Dearden is only liable for 25% of the $2,500,000 of noneconomic damages which the jury awarded, he has joint and several liability with Dr. El Genaidi for the full $742,733 in economic damages. Accordingly, a remand is required for the entry of an amended judgment which accurately reflects Dr. Dearden's liability under the provisions of the Comparative Negligence Act in effect at the time of Dr. Dearden's malpractice.

Dearden's experts also testified that there is no requirement that such blood tests be performed on a well baby, and because there was no indication Matthew had any abnormality, Dr. Dearden did not deviate from the applicable standard of care in discharging him from the hospital without first requiring those tests to be completed.

It appears from the verdict that the jury accepted the opinion of plaintiffs' experts that the baby had an infection at or shortly after birth which could have been detected by the timely performance and review of a CBC.

## I

Dr. Dearden argues that by allowing plaintiffs to use his deposition testimony as expert opinion evidence regarding the applicable standard of care, the trial court violated the evidence rule of *Hull v. Plume, supra,* 131 *N.J.L.* 511, 37 *A.*2d 53, that a plaintiff in a medical malpractice action cannot compel a defendant doctor to express an expert opinion.

This argument is based on the following deposition testimony of Dr. Dearden which was read to the jury over his objection and subsequently referred to in plaintiffs' cross-examination of several defense witnesses:

Q. Dr. Dearden, if you can take a look at the chart, I don't mean to be obscure. Am I correct that in accordance with the standard practice at the hospital a C.B.C. was ordered for Matthew Hutchinson as it was for every newborn at that time?

A. That is correct.

Q. Well, let's do it this way. Take a look at the order page, if you would, Doctor. Am I correct that the order page is something you would have looked for—looked at, excuse me, something you would have looked at for Matthew Hutchinson after you completed your examination?

A. Yes.

Q. In any event, the orders that I'm referring to for the C.B.C. are standing orders at the hospital as of that time, correct?

A. That is correct.

Q. So, they were ordered and you were aware that every baby had a C.B.C. order on the chart?

A. Right.

Q. And do you recall whether you looked for the results of the C.B.C. after your examination of Matthew? I'm asking you for your recollection now, sir?

A. It's my normal practice to look over these records, yes.

Q. Now on the chart that you have before you, with the understanding it's not the original office record but I assume that it's an authentic copy, are there results of the C.B.C. in your copy that you have before you today?

A. Yes, they are.

. . . .

Q. What does not appear that's included within these C.B.C. . . . .

A. A full C.B.C. with dif[ferential] includes a white blood cell count which is not here. An account of the subsets of the white blood cells, the differential, that is not in this chart.

Q. And what is the purpose of the white blood cell count in the analysis of the subsets with differential? What's the purpose if a pediatrician orders that test?

A. To assess the level of white blood cells.

Q. What's the purpose of assessing the white blood cells?

A. To look for possible signs of infection.

. . . .

Q. Doctor, how were the standing orders for newborns established as they appear back in August of 1991, and in particular on the chart of Matthew Hutchinson, if you know?

A. I have an idea.

Q. What was that?

A. They're established through discussions of the pediatric department and the pathology department of the hospital.

. . . .

Q. Did you consider these particular orders, the ten orders that appear here, to be the standard of care in standing orders for newborns as of August of 1991?

A. Yes.

. . . .

Q. In August of 1991, Dr. Dearden, did the standard of care for pediatrics in discharging a newborn infant from the hospital require that the discharging physician ascertain the laboratory values of all studies that had been conducted on the infant during his stay in the hospital?

A. It would require proper follow up on that.

Q. I think my question was, did the standard of care require that the discharging physician obtain the results of all studies that had been conducted on the child during his admission?

A. I can answer the question. Yes, it behooves the Doctor to follow up on the lab values.

■ Although we agree with Dr. Dearden that this testimony would fall within *Hull*'s broad proscription against a plaintiff in a

medical malpractice action eliciting an expert opinion from a defendant doctor, we conclude that *Hull* no longer represents the law of this State. In *Rogotzki v. Schept,* 91 *N.J.Super.* 135, 219 *A.*2d 426 (App.Div.1966), we held that a plaintiff in a medical malpractice can ask questions of a defendant doctor in a deposition which seek to elicit expert opinions relevant to the diagnosis and treatment of the plaintiff. We distinguished *Hull* on the grounds that "it involved testimony sought to be elicited at the trial itself" rather than a deposition and that "the questions there objected to endeavored to elicit from the witness 'information as to various forms or hypothetical methods of treatment.'" 91 *N.J.Super.* at 147, 219 *A.*2d 426 (quoting *Hull, supra,* 131 *N.J.L.* at 516, 37 *A.*2d 53). However, Judge Goldmann, speaking for the court, went on to say:

Were we called upon to pass on the question considered in *Hull,* and were the *Hull* opinion that of a court other than our former Court of Errors and Appeals, we would deem its result somewhat less than an enlightened one. In our view, it runs counter to the trend of liberal decisions where the aim is to reach at the truth of the matter, rather than indulge in the niceties which have so often characterized evidence law in the past.

A ready example of the more enlightened and practical view is *McDermott v. Manhattan Eye, Ear & Throat Hospital,* 15 *N.Y.*2d 20, 255 *N.Y.S.*2d 65, 203 *N.E.*2d 469 (Ct.App.1964). The single question posed in that appeal, and one of first impression in New York, concerned the right of a plaintiff in a malpractice suit to call to the witness stand the doctor he was suing and question him as a medical expert. Judge Fuld, writing for a unanimous court, had this to say—and we quote him at length because we so fully agree with him:

"* * * That the defendant is an 'expert' and that the particular questions asked of him are those which only an expert can answer, seem beside the point. It is at least arguable that the doctor's knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters of 'fact' as are the diagnosis and examination he made or the treatment upon which he settled. More importantly, however, by allowing the plaintiff to examine the defendant doctor with regard to the standard of skill and care ordinarily exercised by physicians in the community under like circumstances and with regard to whether his conduct conformed thereto, even though such questions call for the expression of an expert opinion, the courts do no more than conform to the obvious purpose underlying the adverse-party-witness rule. That purpose, of course, 'is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action.' The issue whether the defendant doctor deviated from the proper and approved practice customarily adopted by physicians practicing in the community is assured-

ly 'pertinent and relevant' to a malpractice action. Indeed, absent such proof, the plaintiff's case would have to be dismissed. Moreover, evidence on this issue is, in most instances, 'available' from the defendant doctor.

The importance of enabling the plaintiff to take the testimony of the defendant doctor as to both 'fact' and 'opinion' is accentuated by recognition of the difficulty inherent in securing 'independent' expert witnesses. It is not always a simple matter to have one expert, a doctor in this case, condemn in open court the practice of another, particularly if the latter is a leader in his field. In consequence, the plaintiff's only recourse in many cases may be to question the defendant doctor as an expert in the hope that he will thereby be able to establish his malpractice claim.

There is nothing unfair about such a practice. Unlike his counterpart in a criminal prosecution, the defendant in a civil suit has no inherent right to remain silent or, once on the stand, to answer only those inquiries which will have no adverse effect on his case. Rather, he must, if called as a witness, respond to virtually all questions aimed at eliciting information he may possess relevant to the issues, even though his testimony on such matters might further the plaintiff's case. We cannot agree with the suggestion that it is somehow neither sporting nor consistent with the adversary system to allow a party to prove his case through his opponent's own testimony but, whatever the merits of this view, we prefer to believe that, in a situation such as the present, * * * facts overcomes any detriment which might be suffered by the adversary system."

[*Id.* at 147–49, 219 A.2d 426 (internal citations and quotations in *McDermott* omitted).]

Dr. Dearden correctly notes that our approval in *Rogotzki* of the views set forth in *McDermott* was dictum and that this court has no authority to overrule a decision of the Court of Errors and Appeals. However, in *Lanzet v. Greenberg*, 126 *N.J.* 168, 191, 594 A.2d 1309 (1991), the Supreme Court indicated its approval of *Rogotzki*, stating that:

Proof of deviation elicited from the defendants themselves, because they are competent professionals, could be relied on by the jury. *Rogotzki v. Schept*, 91 *N.J.Super.* 135, 148–49, 219 A.2d 426 (App.Div.1966); *Lawless v. Calaway*, 24 *Cal.*2d 81, 90–92, 147 P.2d 604, 609 (1944).

By referring to "[p]roof of deviation elicited from the defendants ... *because they are competent professionals*," and citing *Rogotzki*, the Court must have had in mind the expert opinions of the defendant doctor relating to the alleged malpractice. This conclusion is supported by the Court's pinpoint citation to the previously quoted two pages of *Rogotzki* which endorsed the reasoning of the New York Court of Appeals' in *McDermott* upholding the admissibility of such evidence, as well as the other case the Court cited,

*Lawless v. Calaway,* 24 *Cal.*2d 81, 147 *P.*2d 604, 609 (1944), which expressly states, contrary to *Hull,* that "[i]t is well settled that a plaintiff in a malpractice action can establish his case by the testimony of the defendant therein," and that "[n]either the letter nor the spirit of the statute suggests any reason why the defendant in such an action should not be examined with regard to the standard of skill and care ordinarily exercised by doctors in the community under like circumstances and with respect to whether his conduct conformed thereto."

Our conclusion that *Hull* 's prohibition against a plaintiff in a medical malpractice case eliciting any form of expert opinion from the defendant no longer represents the law of this State is reinforced by *Stigliano v. Connaught Laboratories Inc.,* 140 *N.J.* 305, 658 *A.*2d 715 (1995), in which the Court adopted an expansive view of the scope of questions which may be asked of any treating physician, including a non-party. In upholding the admissibility of the deposition testimony of plaintiff's treating physicians regarding the cause of the seizures which were the subject of her malpractice claim, the Court stated:

> Although the treating doctors are doubtless "experts," in this case they are more accurately fact witnesses. Their testimony relates to their diagnosis and treatment of the infant plaintiff. In this context, moreover, the characterization of the treating doctors' testimony as "fact" or "opinion" creates an artificial distinction. [*Id.* at 314, 658 *A.*2d 715.]

Similarly, Dr. Dearden's testimony that the normal practice in his hospital—and his own normal practice—is to follow up on the results of lab tests performed on newborns before their discharge, was not expert opinion testimony. Rather, it was testimony explaining what he did, and why, when treating the infant plaintiff. His further testimony that the hospital's standing orders constitute the applicable standard of care did not add materially to his prior testimony regarding his examination of Matthew.

Furthermore, *Hull* 's prohibition against asking a defendant doctor in a malpractice action for an expert opinion relevant to the plaintiff's claim cannot be reconciled with the rules of evidence adopted by our present Supreme Court. *N.J.R.E.* 402

provides that "[e]xcept as otherwise provided in these rules or by law, all relevant evidence is admissible." Because the opinion of a defendant doctor in a malpractice action concerning the standard of care which governed plaintiff's care is clearly relevant, that opinion is admissible unless made inadmissible by law. Dr. Dearden suggests that such law may be found in the common law rule prohibiting the appropriation of a "witness' expert knowledge without compensation." *Adamski v. Moss,* 271 *N.J.Super.* 513, 520, 638 *A.2d* 1360 (App.Div.1994). However, this rule has no applicability to a party to the action who may be compelled to appear and give testimony without compensation. *See R.* 1:9–1. Therefore, we perceive no basis under *N.J.R.E.* 402 for the exclusion of a defendant doctor's trial or deposition testimony relating to the applicable standard of care.

Dr. Dearden argues that *Lanzet* cannot be construed to have overruled *Hull* because the testimony of the defendant doctor in *Lanzet* was purely factual and did not involve any expert opinion regarding the applicable standard of care or a deviation from that standard. However, this court cannot disregard the Supreme Court's statement of governing law merely because it may have gone beyond what was required to decide the case before the Court and consequently constituted dictum. *See Burrell v. Quaranta,* 259 *N.J.Super.* 243, 252, 612 *A.2d* 379 (App.Div.1992) ("While, as a general rule, we are bound by the decisions of the State's highest courts, including the Court of Errors and Appeals, an exception exists where more recent decisions of the Supreme Court clearly undermine the authority of a prior decision, although not expressly overruling it."); *accord Kass v. Brown Boveri Corp.,* 199 *N.J.Super.* 42, 53, 488 *A.2d* 242 (App.Div.1985); *State v. Ciuffini,* 164 *N.J.Super.* 145, 152, 395 *A.2d* 904 (App.Div.1978); *cf. Roadway Express, Inc. v. Director, Div. of Taxation,* 50 *N.J.* 471, 475, 236 *A.2d* 577 (1967) ("[T]he measure of [a lower court's] duty is to divine, as best it can, what would be the event of an appeal [to the United States Supreme Court] in the case before it.") (quoting *Spector Motor Service, Inc. v. Walsh,* 139 *F.2d* 809, 823

(1943) (Hand, L., dissenting) (alteration in original)), *appeal dismissed,* 390 *U.S.* 745, 88 *S.Ct.* 1443, 20 *L. Ed.*2d 276 (1968).

In sum, we conclude that the authority of *Hull* has been so thoroughly undermined by *Lanzet, Stigliano* and the current evidence rules that it no longer represents the controlling law in this State. Therefore, the trial court properly allowed plaintiffs to use Dr. Dearden's deposition testimony as evidence of the applicable standard of care.

## II

Dr. Dearden also argues that the trial court erred in denying his motion for a directed verdict, because plaintiffs' experts disagreed as to whether he breached the applicable standard of care and the court erroneously allowed Dr. Sweeney to give an opinion on an issue on which he had declined to express any opinion at his deposition. These arguments are clearly without merit.

Dr. Sweeney testified that the E-coli infection was acquired around the time of Matthew's birth; that a CBC should have been performed because both the mother and the baby had a temperature for a short period of time after the delivery; that it was "more likely than not" that the results of a CBC would have been abnormal; that Dr. Dearden deviated from the accepted standard of care in failing to follow-up on the CBC test results; and that there was a reasonable probability that the E-coli infection could have been controlled if it had been detected prior to Matthew's discharge from the hospital. Even without considering Dr. Dearden's testimony regarding the standard of care at the hospital, this testimony was sufficient to support the jury's finding that Dr. Dearden committed malpractice.

Moreover, Dr. Sweeney's testimony was not somehow rendered insufficient to support the jury's verdict simply because another one of plaintiffs' expert witnesses, Dr. Robert Vannucci, did not conclude that Dr. Dearden had committed malpractice. A party does not vouch for and thus is not bound by the testimony of

a witness he calls at trial. *State v. Ross,* 80 *N.J.* 239, 252–53, 403 *A.*2d 457 (1979); *State v. Curtis,* 195 *N.J.Super.* 354, 370, 479 *A.*2d 425 (App.Div.), *certif. denied,* 99 *N.J.* 212, 491 *A.*2d 708 (1984); *accord Ladner v. Campbell,* 515 *So.*2d 882, 888 (Miss.1987); *Diggs v. Lail,* 201 *Va.* 871, 114 *S.E.*2d 743, 748 (1960). The only contrary authority cited by Dr. Dearden are Pennsylvania cases which hold that a plaintiff's case may fail if the testimony of two expert witnesses he calls are so absolutely contradictory that a jury is left with no guidance on an issue. *See, e.g., Brannan v. Lankenau Hosp.,* 490 *Pa.* 588, 417 *A.*2d 196, 200 (1980); *Mudano v. Philadelphia Rapid Transit Co.,* 289 *Pa.* 51, 137 *A.* 104 (1927). However, those decisions are clearly inconsistent with the law in this State and in most other jurisdictions, and we decline to follow them. Therefore, we conclude that a party may prevail based solely on the testimony of one expert witness even though that testimony is not supported by the testimony of another witness called by that party.

■ Dr. Dearden's second argument relating to the adequacy of the evidence to support the verdict is that the court should not have allowed Dr. Sweeney to testify that the CBC test which was supposed to be performed in the hospital would have revealed the E-coli infection, because Dr. Sweeney testified at his deposition that he had no opinion on this issue.

Dr. Sweeney gave the following testimony at his deposition:

Q. Yes or no, can you give me an opinion to a reasonable medical probability as to whether or not had a CBC and differential been done while this infant was in the hospital, it would have shown the presence of infection?

A. I would have to answer that question no.

. . . .

Q. Do you have an opinion, yes or no, to a reasonable medical probability as to whether or not this child had an infection when it left the hospital on August 18th, 1991?

A. My answer would have to be yes.

. . . .

Q. You've told me you have an opinion. Now I want to know what your opinion is to a reasonable medical probability.

A. My opinion is that the child had an infection or may have had an infection at the time of discharge from the hospital.

Q. There's a big difference between had and may have had. My question to you was do you have an opinion as to whether or not he did have an infection, yes or no, at the time when he left the hospital. . . .

[W]hat is your opinion to a reasonable medical probability as to whether or not this child had an infection when he left the hospital on August 18th, 1991?

A. I think the child may have had an incubating infection at the time of discharge from the hospital.

Q. Doctor, he may have had a lot of things. May means he may have had, he may not have had. Doctor, when you use the word may are you saying he may have had it, he may not have had it?

A. That's correct.

. . . .

Q. Isn't it true, Doctor, that you can't give me an opinion based on reasonable medical probability one way or the other as to whether or not this child had an infection when he left the hospital August 18th, 1991?

A. The only way to document with 100 percent certainty that this child would have had an infection at the time would be to have had documentation via blood culture or blood work that the infection existed. . . .

My opinion stated was that the child may—may have likely had an infection when he was discharged, an incubating infection when he was discharged from the hospital.

Thus, the thrust of Dr. Sweeney's deposition testimony was not that he had no opinion at all as to whether Matthew had an E-coli infection at the time of discharge from the hospital but rather that he was reluctant to express an opinion in terms of a reasonable degree of medical probability. Under these circumstances, Dr. Dearden could not have been surprised and consequently was not prejudiced when plaintiff elicited Dr. Sweeney's opinion regarding this question at trial. Therefore, the trial court did not abuse its discretion in allowing this testimony. *See Amaru v. Stratton,* 209 *N.J.Super.* 1, 11, 506 *A.*2d 1225 (App.Div.1985).

 Finally, we note that under *Gardner v. Pawliw,* 150 *N.J.* 359, 387–90, 696 *A.*2d 599 (1997), which was decided after the trial in this case, a medical expert is no longer required to testify that there is a reasonable probability a medical test which was not performed would have resulted in avoiding the harm to the plaintiff. Instead, it is sufficient if the plaintiff can show that "the failure to give the test increased the risk of harm from the

preexistent condition." *Id.* at 387, 696 *A.*2d 599. Consequently, a medical expert in this kind of case is no longer required to give an expert opinion in the language of reasonable medical probability which Dr. Sweeney was reluctant to use at his deposition.

### III

Dr. Dearden argues that the trial court's instructions regarding proximate causation were incorrect.

After giving the jury a standard proximate causation instruction with respect to the obstetrician, Dr. Feldman, the court gave the following causation instruction with respect to the pediatricians, including Dr. Dearden:

> The allegation here is not that their conduct created the condition. The claim is that when the plaintiff was seen by each pediatrician, he had a condition which, by itself, had a risk of causing the harm he ultimately experienced. However, plaintiff claims that the defendants['] negligence increased the risk of harm and was a substantial factor in producing the ultimate injury. To establish proximate cause under these circumstances, first plaintiff must prove by a preponderance of the credible evidence that the defendant's negligence increased the risk of harm posed by plaintiff's condition. Second, plaintiff must prove by a preponderance of the evidence that the increased risk was a substantial factor in producing the ultimate result. If the negligent act was too remotely or insignificantly related to the ultimate result, then in a legal sense, such negligent act does not constitute a substantial factor. And again, you can talk about either an act or failure to act.

> In cases where the defense [sic] negligence accelerated or worsened plaintiff's condition, or if it failed to prevent the spread of plaintiff's condition where it could have done so, if in fact there hadn't been a deviation, then the defendant is responsible for all of plaintiff's injuries unless plaintiff's injuries are capable of reasonable apportionment. And in this case, there has been no testimony as to an apportionment of the injuries. Here defendant pediatricians have claimed that nothing that they did caused or would have changed plaintiff's injuries. And plaintiff claims that if the pediatricians weren't negligent and had properly treated the condition, that all the ultimate injuries could have been avoided. So, if you were to find for the plaintiff on deviation from a standard of care and find that there was proximate cause, then the doctor would be responsible for the injuries which have resulted.

Although Dr. Feldman's counsel objected to this instruction on the ground that the distinction between the two charges on proximate causation was not as clear as it could have been, Dr. Dearden's counsel stated that the distinction was "quite clear."

The court agreed and did not give the jury any additional instruction regarding proximate causation.

The court gave the jury a verdict sheet which required it to answer two questions for each defendant: first, whether the defendant deviated from accepted standards of medical practice; and second, whether this deviation was a proximate cause of Matthew's injuries. No distinction was made on the verdict sheet between the type of proximate cause necessary to find Dr. Feldman liable and the type needed to find the other defendants liable. None of the defendants objected to the form of the verdict sheet.

Dr. Dearden makes several arguments regarding the jury instructions and verdict sheet relating to proximate cause. First, he argues that the trial court erred in giving the jury a modified causation instruction in the form suggested by *Scafidi v. Seiler*, 119 *N.J.* 93, 108–09, 574 *A.*2d 398 (1990) with respect to plaintiffs' claims against the pediatricians. However, plaintiffs' evidence would clearly support a jury finding that Matthew had a preexisting E-coli infection when he was examined by Dr. Dearden and that Dr. Dearden's failure to diagnose and treat this condition increased the harm from the preexisting infection. Therefore, the court properly gave the jury a *Scafidi* form of proximate causation instruction with respect to the pediatricians. See *Gardner, supra*, 150 *N.J.* at 387, 696 *A.*2d 599; *Scafidi, supra*, 119 *N.J.* at 109, 574 *A.*2d 398; *Arenas v. Gari*, 309 *N.J.Super.* 1, 24, 706 *A.*2d 736 (App.Div.1998).

 Dr. Dearden's second argument relating to the proximate causation instructions is that the court failed to give defendant's theory of proximate cause to the jury. However, the court informed the jury during its proximate cause instructions that "defendant pediatricians have claimed that nothing that they did caused or would have changed plaintiff's injuries." Moreover, Dr. Dearden not only failed to object to the proximate causation instructions but expressed satisfaction with them. Therefore, he is barred from objecting to the specific language of the instruc-

tions on appeal. *See Nesta v. Meyer,* 100 *N.J.Super.* 434, 446, 242 *A.*2d 386 (App.Div.1968).

Finally, Dr. Dearden argues that the jury verdict sheet was inadequate because it failed to reflect the different proximate cause tests that applied to plaintiff's claims against Dr. Feldman and the pediatricians. However, neither Dr. Dearden nor any other defendant objected to the verdict sheet and consequently they are now barred from asserting that the verdict sheet should have been worded differently. *Ibid.* In any event, the court's instructions made it clear that the jury was to apply one definition of proximate cause to Dr. Feldman and another to the remaining defendants. There was no need to repeat this distinction on the verdict sheet.

Accordingly, we affirm the verdict in plaintiffs' favor against Dr. Dearden and remand for the entry of an amended judgment in conformity with the Comparative Negligence Act.